THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DEWAYNE GROVES, Defendant-Appellant.

First District (3rd Division)   No. 1—95—4074

Opinion filed February 4, 1998.

Michael J. Pelletier and John S. Young, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, James

E. Fitzgerald, and Julie Line Bailey, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAHILL delivered the opinion of the court:

After a jury trial defendant, Dewayne Groves, was found guilty of attempted first degree murder, armed violence, aggravated battery, and aggravated battery of a child. He was sentenced to 30 years in prison. Defendant appeals. We affirm.

At trial, Michael Watson and John Wade testified for the State about the events that led up to a shooting on June 4, 1995. About a half hour before the shooting, Watson was talking with a neighbor in the alley behind his house when he saw defendant and a group of men, including Wade, gathering in the alley. Watson had lived at 148th and Maplewood for 28 years and had known defendant "all his life."

Two of the men, Shantell and Antoine, separated from the rest of the group as though they were about to fight. They had fought each other the day before and Shantell had stabbed Antoine in the shoulder. According to Wade, Shantell was "acting kind of crazy" and "pretending to have a gun."

Before blows were struck, Donald Hargrove walked up to the group and broke up the fight, telling everyone to go home. Hargrove yelled "GD, GD, GD" which, the record reveals, stood for Gangster Disciples. Both Watson and Wade recalled that Hargrove walked up to defendant, who was a Black Disciple (BD), and "got in his face" by yelling "GD!" and holding his finger in defendant's face. According to Wade, who was in the alley, Hargrove also pushed defendant and told him he would harm him if the fight went forward.

Defendant and the rest of the group began to disperse, and Wade heard defendant say, as he walked out of the alley with David Carothers, that he was going to "get some of his BD's." Defendant and code-fendant Carothers then got into a black car and drove off. Shantell calmed down and the rest of the group, including Watson, Wade, Hargrove, Shantell and Antoine, walked from the alley to the front of the houses.

About a half hour after defendant and Carothers left, Watson, Wade, Antoine, Hargrove and some of the other men from the alley were standing in front of Wade's house at 148th and Maplewood, on the west side of the street. Several neighborhood children were playing nearby.

Four-year-old Shaneal was on her bike, next to Hargrove, as a black car came down the street toward the group. The car, which both Wade and Watson recognized, was coming toward them at a

normal rate of speed. Defendant was in the front passenger seat and Carothers was driving; neither man attempted to hide his identity and both were looking at the group. Neither Watson nor Wade could see if anyone was in the back seat of the car, because the back windows were tinted and they were opened only slightly.

Just as the car reached the group, it slowed to one or two miles per hour, and an arm holding a gun emerged from the partially opened rear passenger window behind the driver's side. The shooter began firing at the group. Watson and Wade were unable to identify the shooter. However, they were certain defendant, who was visible and sitting in the front passenger seat, was not the shooter. The shooting stopped for a moment as the car crawled forward, and it appeared to Wade as though the shooter moved closer to the window for a better shot.

Watson and the other men began pushing the children down on the ground, and the shooter fired a second round of shots. The shooting stopped again for a moment and then the shooter fired a third round of shots. The car then sped off, turned around in a cul-de-sac, and drove back down the street. Both Wade and Watson estimated that a total of five or six shots were fired.

As Wade got up from the ground, he saw that Shaneal had been shot. Wade's brother picked up the little girl and took her to Wade's van. Wade drove Shaneal to the hospital.

Meanwhile, Watson ran into his house to call the police. Watson and some of the other men then started down the street to tell Shaneal's mother what had happened.

After Wade drove back from the hospital he saw defendant and Carothers walking into a minimart at 150th Street and Dixie Highway, about four blocks east of the scene of the shooting. Wade went home to see if the police were still at the scene. Upon learning that the police had left, Watson, Wade and several other men got into a van and went to the minimart to meet defendant and Carothers.

Defendant and Carothers walked out of the minimart, eating chips and drinking pop. They did not flee or resist when the group confronted them. The group detained defendant and Carothers until the police came and arrested them.

The defense presented no witnesses. The jury found defendant guilty.

Defendant first argues that the trial court erred in denying defendant's motion to suppress his statement. He claims it was obtained in violation of the fourth and fifth amendments of the United States Constitution and in violation of the Illinois Constitution and Illinois law. Specifically defendant argues that he was not brought in

front of a judge until four days after his arrest and this delay and the surrounding circumstances negate the voluntariness of his confession.

The State argues that the issue is waived because it was not specifically raised in defendant's posttrial motion. We find the issue was properly preserved since defendant stated in his posttrial motion that the court erred in admitting his out-of-court statements. *People v. Brown*, 150 Ill. App. 3d 535, 540-41, 501 N.E.2d 1347 (1986) (specificity in a posttrial motion is sufficient when it alerts the trial judge to the error).

At the hearing on defendant's motion to quash and suppress his statement, Detective Williams and Assistant State's Attorney Cece testified that they interviewed defendant various times between June 4 and June 7, 1995, while defendant was in custody. They testified that he was given *Miranda* warnings each time. On two occasions he signed a form waiving his *Miranda* rights. According to Williams and Cece, defendant was interviewed six times during that time period at different times of the day and night.

A prisoner log reflected that defendant was fed on June 5, 1995, at 1:30 p.m., on June 6, 1995, at 7 a.m., 1:30 p.m., and 8:10 p.m., and on June 7, 1995, at 7 a.m. and 1:30 p.m.

Williams stated that during the time defendant was in custody, Williams was conducting lineups, looking for witnesses, examining the crime scene and looking for other evidence.

Barbara Anderson, codefendant Carothers' fiancée, testified that she spoke with Detective Williams by telephone on June 4, 1995, at about 5 p.m. Williams told Anderson that there were no charges pending against defendant and Carothers and that it would be easier for the codefendants if the shooter were found. They spoke again by telephone on June 5, 1995, at about 4 p.m. Williams then brought Anderson a picture to identify the shooter. Anderson was also brought to the police station.

After speaking with Detective Williams by telephone on June 5 and 6, 1995, Anderson was offered a chance to visit Carothers at 11 p.m. on June 7, 1995. Williams drove Anderson to the station and while in the car Williams told Anderson that Carothers and defendant were not cooperating.

Anderson testified that she received six or seven telephone calls from defendant between June 5 and June 7. One call was on June 6, 1995, at 3 a.m. and the next was 11 p.m. the same day. Some of the calls were three-way conversations with a person Anderson believed to be Detective Williams.

Gerlene Foulks, defendant's mother, testified that on the evening

of June 4, 1995, she heard that her son had been arrested. She went to the Harvey police station at about 6 p.m. and was told that they had no record of her son being arrested. Ms. Foulks called the station on June 5 and left several messages for Detective Lewellyn, which were not returned. She called again on June 7 and was told that her son was being interrogated. Ms. Foulks finally spoke with defendant on June 9.

Defendant testified that he was 19 years old and had been arrested two other times. Defendant testified that his cell was cold and that his cell and mattress were dirty. He did not get much sleep from June 4 to June 8, 1995. Defendant was fed one small doughnut and coffee for breakfast and a small hamburger and a few fries for lunch. On June 7, 1995, defendant gave his statement at about 2:30 a.m. He had slept an hour or two the previous 24 hours. He was tired and hungry. The only telephone calls he was able to make were to Barbara Anderson, at the instruction of the officers. Defendant did not sleep much while in custody because his cell was close to the processing area. He did use the washroom facilities in this cell.

Defendant testified that while he was giving his statement, Assistant State's Attorney Cece, in the presence of Williams and Lewellyn, grabbed a chair, slammed it down and told defendant to sit down and "tell it like he wanted to hear it." Williams told defendant that he was going to be charged with murder and put to death by lethal injection or the electric chair. Defendant then began to cry.

Defendant further testified that Cece wrote the statement and that he and Cece were in the room for 2½ hours while the statement was prepared. Defendant was not given an opportunity to write the statement. Defendant and Carothers were together when the statement was written. Cece added the reference to the street gangs in the statement. Defendant signed the statement after being told to by Cece and while he was crying. Defendant stated that Cece ripped up the first statement defendant gave and wrote a second statement. At the hearing, defendant identified his signature on each page of the eight-page statement but testified that he did not read the statement.

Defendant did not allege that Cece or officers physically abused or mistreated him. Defendant acknowledged that he had been read *Miranda* rights before speaking with the officers, but they were not read to him before his conversation with Williams on June 4, 1995. Williams told defendant that he would be released if he cooperated.

On June 5, 1995, defendant voluntarily took Williams to the shooter's home. Defendant acknowledged his signature on a *Miranda* form dated June 5, 1995, but did not recall signing it that day. Defendant believed that Cece gave him that document to sign after he signed the written statement.

Cece, Williams and Lewellyn were present during defendant's three or four telephone calls to Barbara Anderson. Defendant never told Lewellyn that he wanted a lawyer. On Monday June 5, 1995, Williams told defendant that the victim had died.

Assistant State's Attorney Cece was recalled as a rebuttal witness and denied that he had defendant sign a *Miranda* rights form dated June 5, 1995. Cece denied shouting or slamming down a chair during his interview with defendant. Cece also denied that he tore up one statement and wrote another. Cece claimed that defendant made corrections to his statement. Cece acknowledged that he, not defendant, wrote the changes. Cece spoke with defendant for an hour and a half with Detective Lewellyn present. Defendant did not tell Cece he was mistreated, deprived of sleep or not fed. Defendant showed no sign of injury. Cece denied that defendant was told that the victim had died and that he would be charged with first degree murder and put to death by lethal injection or the electric chair. Cece also denied that defendant was told that he would be released if he cooperated.

Cece testified that defendant agreed to give a written statement and that Cece wrote the statement, incorporating his questions and defendant's answers. Only one version of defendant's statement was written. Defendant read a portion of the statement out loud, made corrections and signed the statement.

On cross-examination, Cece testified that he may have awakened defendant when he spoke to him at 3 a.m. on June 7, 1995. Cece acknowledged that he transcribed defendant's statement even though defendant could read and write. Cece stated that defendant's statement was not taken verbatim.

Cece also testified he did not take a written statement from defendant when he spoke to him at 3 a.m. because of the continuing investigation to find the shooter. The first time defendant was brought before a judge was June 8, 1995.

Detective Lewellyn testified that on the morning of June 5, 1995, he interviewed defendant in the presence of Williams. Lewellyn identified the *Miranda* rights form defendant signed that morning. Lewellyn stated that June 5, 1995, was the only day that he attended an interview of either defendant or Carothers. Lewellyn denied telling defendant that the victim had died or that defendant would be charged with first degree murder and put to death. As of June 5, 1995, defendant had not been charged but was still being held for questioning.

The trial court denied defendant's motion to suppress his statement, finding that defendant's age, previous contacts with law enforcement officials, ability to speak with Barbara Anderson by

telephone, and opportunity to sleep and eat during custody showed that his statement was voluntarily given. The trial court also disbelieved defendant's testimony that he had signed documents that he had not read.

■ Generally, we may not disturb a trial court's ruling on a motion to suppress unless it is manifestly erroneous. *People v. James*, 163 Ill. 2d 302, 645 N.E.2d 195 (1994). However, when neither the facts nor credibility of the witnesses is in dispute, we may review the ruling *de novo. People v. Dilworth*, 169 Ill. 2d 195, 201, 661 N.E.2d 310 (1996). Here, facts are in dispute and the credibility of witnesses is at issue. So we must decide whether the trial court's findings were manifestly erroneous.

■ Defendant argues that his statement should have been suppressed because Illinois law provides that an arrested person shall be arraigned "without unnecessary delay." 725 ILCS 5/109—1(a) (West 1994). Under the fourth amendment of the United States Constitution, a defendant arrested without a warrant has the right to a probable cause hearing as a prerequisite to an extended restraint on liberty. *People v. Dees*, 85 Ill. 2d 233, 237, 422 N.E.2d 616 (1981).

The Supreme Court has held that a judicial determination of probable cause within 48 hours of arrest generally passes constitutional muster. *County of Riverside v. McLaughlin*, 500 U.S. 44, 56, 114 L. Ed. 2d 49, 63, 111 S. Ct. 1661, 1670 (1991). When a probable cause determination is not made within 48 hours of arrest, the defendant no longer has the burden to show unreasonable delay. The burden shifts to the State to show the existence of an emergency or other extraordinary circumstance. *McLaughlin*, 500 U.S. at 57, 114 L. Ed. 2d at 63, 111 S. Ct. at 1670.

The Supreme Court has not fashioned a remedy for the State's failure to obtain judicial authorization for a significant pretrial detention period that violates the fourth amendment. See *Powell v. Nevada*, 511 U.S. 79, 128 L. Ed. 2d 1, 114 S. Ct. 1280 (1994).

While there is no separate remedy for violation of the presentment rule, our supreme court has held that the delay is a factor to be considered when determining whether the confession was voluntary. *People v. House*, 141 Ill. 2d 323, 380, 566 N.E.2d 259 (1990).

■ To determine if a statement is made voluntarily, we consider the defendant's age, education and intelligence, his experience with the criminal justice system, the duration of the detention and the interrogations, whether the defendant was advised of his constitutional rights, and whether defendant was subjected to physical mistreatment or abuse. *People v. Williams*, 230 Ill. App. 3d 761, 776, 595 N.E.2d 1115 (1992).

Defendant argues that the length of confinement is a factor that should be weighed heavily in his favor, given that the State gave no extraordinary circumstances to justify detaining him so long. Defendant adds that he was only 19, did not sleep much, may have been awakened during the night to be interrogated, and that many of the interrogations happened in the late evening and early morning hours.

Defendant observes that a delay for the purpose of "gathering *** additional evidence to justify the arrest" was listed by the Supreme Court as one example of an "unreasonable" delay. Officer Williams testified that additional investigative activities happened during defendant's detention, but the record does not reflect that the delay in his arraignment was caused by gathering additional evidence to support his arrest. Defendant has never claimed that he was arrested without probable cause. According to Williams' testimony, the officers were trying to obtain information about the shooter.

■ The record reflects that defendant engaged in an ongoing dialogue with police throughout his detention. Illinois courts have expressly held that "the 'delay' involved in taking a voluntary statement from a suspect" who is in lawful custody, had knowingly waived his *Miranda* rights and expressed a willingness to talk to police, constitutes a "necessary" delay within the terms of the Illinois statute. *People v. Smith*, 203 Ill. App. 3d 545, 563, 561 N.E.2d 252 (1990). As the *Smith* court explained, the Illinois prompt presentment statute does not oblige the police to "interrupt" an interrogation so long as the length is not unreasonable and the suspect's statements continue to be voluntary. *Smith*, 203 Ill. App. 3d at 563.

The record shows that defendant made several brief statements to the police during his detention. Each statement was made after defendant waived his *Miranda* rights. The State contends that the reason for the delay was to follow up on the information defendant gave them. Defendant's own witnesses establish that he was engaged in a voluntary dialogue with the police during his detention. According to defendant, he voluntarily agreed to show detectives "where the shooter stayed." Barbara Anderson testified that beginning on the night of Monday, June 5, defendant made the first of several calls to her house from the police station. Defendant asked her questions about the alleged shooter. Defendant called Anderson at least four times between June 5 and June 7. Anderson stated that, during the first three calls, she was able to provide defendant with information about the alleged shooter, which she believed defendant relayed to the police.

At the suppression hearing the court heard all the evidence and determined that defendant's age, previous experience with law

enforcement, his ability to speak to Anderson on the telephone, and his opportunity to sleep and eat while in custody showed that his confession was voluntarily given. The court found the State's witnesses more credible. Determining the credibility of witnesses and resolving conflicts in testimony are functions of the trial court. *People v. Hill*, 272 Ill. App. 3d 597, 603, 650 N.E.2d 558 (1995). A reviewing court will give great deference to the trial court's factual findings because the court stands in the best position to weigh the credibility of the witnesses. *Hill*, 272 Ill. App. 3d at 604. The court's finding was not manifestly erroneous.

■ Defendant next argues that his convictions should be reversed because there was reasonable doubt of his guilt under the accountability theory.

A criminal conviction will be set aside when the evidence is so unsatisfactory that reasonable doubt as to defendant's guilt remains. *People v. Byron*, 164 Ill. 2d 279, 299, 647 N.E.2d 946 (1995). Viewing the evidence in the light most favorable to the prosecution, we must determine whether a rational trier of fact could have found all elements of the offense beyond a reasonable doubt. *People v. Kitchen*, 159 Ill. 2d 1, 25, 636 N.E.2d 433 (1994). A conviction under the accountability theory requires the State to prove beyond a reasonable doubt that the defendant, with intent to promote or facilitate the commission of the offense, solicits, aids, abets, agrees or attempts to aid another person in committing the offense before or during the offense. *People v. Smith*, 278 Ill. App. 3d 343, 355, 662 N.E.2d 480 (1996); 720 ILCS 5/5—2(c) (West 1996). Mere presence at the scene, with knowledge that a crime is being committed, is insufficient to establish accountability. *In re W.C.*, 167 Ill. 2d 307, 338, 657 N.E.2d 908 (1995).

■ Defendant relies on *People v. Manley*, 1 Ill. App. 3d 693, 274 N.E.2d 373 (1971). In *Manley* the only evidence that established the defendant was involved in the robbery was that he was standing outside the gas station with a companion at the time another companion committed a robbery inside the gas station. When the defendant found out about the robbery, he fled. He and his companion both testified that the defendant was unaware of the robbery. *Manley*, 1 Ill. App. 3d at 694-95 . The court found reasonable doubt existed as to the defendant's guilt. *Manley*, 1 Ill. App. 3d at 696.

*Manley* is distinguishable. Here, testimony revealed that defendant declared his intent to round up some gang members after he was pushed by Hargrove. Defendant admitted this intent in his statement. This evidence was in addition to defendant's presence in the car during the shooting and his flight from the scene.

Accountability may be established by presence at the scene of the crime, a finding that defendant had knowledge of criminal intent, flight, association with co-conspirators after the incident, and a failure to report the incident. *People v. Batchelor*, 171 Ill. 2d 367, 377-78, 665 N.E.2d 777 (1996).

When we view the facts in the light most favorable to the State we find that a rational trier of fact could have found defendant liable under the accountability theory. Two eyewitnesses place him in the car with the shooter and defendant does not deny his presence in the car. It is reasonable to infer that he had knowledge of criminal intent from his statement that he was going to round up fellow gang members after a scuffle in the alley. His intent to seek retribution was admitted in his statement along with his knowledge of a gun in the car. Evidence also revealed that he fled in the car after the shooting and was seen at a convenience store shortly after the shooting. He did not report the crime. Defendant's conviction was proven beyond a reasonable doubt.

Defendant also argues that there was insufficient evidence of *corpus delicti* for his accountability of the crimes charged.

■ *Corpus delicti* requires proof of the injury or loss and causation of the loss by criminal conduct. *People v. Furby*, 138 Ill. 2d 434, 446, 563 N.E.2d 421 (1990). *Corpus delicti* may not rest solely on a defendant's extrajudicial statement or admission. *People v. Howard*, 147 Ill. 2d 103, 126, 588 N.E.2d 1044 (1991). The State must present independent evidence that tends to show the commission of the offense and to corroborate the facts in the defendant's statement. *Howard*, 147 Ill. 2d at 126-27.

■ Defendant contends that only his statement tends to prove his intent to aid and abet in the shooting. Defendant misapplies *corpus delicti*. We find no case law supporting defendant's position that proof of *corpus delicti* must tend to prove accountability of the crimes charged. Accountability is the theory under which defendant was convicted, but not the crime of which he was convicted. *People v. Holmes*, 67 Ill. 2d 236, 367 N.E.2d 663 (1977). In *Holmes* the defendant argued that *corpus delicti* of accountability-murder was not proven since there must be proof that some person committed an act for which defendant was accountable. The court stated that it is not a requirement of *corpus delicti* that evidence apart from the confession tend to *connect* defendant to the crime charged. *Holmes*, 67 Ill. 2d at 239-40, citing *People v. Norcutt*, 44 Ill. 2d 256, 255 N.E.2d 442 (1970). Proof of *corpus delicti* requires proof of the injury and that it was caused by criminal conduct. Here, there can be no dispute that the eyewitness accounts of the shooting established the *corpus delicti* of

all the crimes charged: attempted first degree murder, armed violence, aggravated battery, and aggravated battery of a child.

■ Last, defendant argues that the trial court erred in sentencing him on a less serious offense and defendant's sentence of 30 years' imprisonment should be reduced because of significant rehabilitative potential.

Since defendant failed to raise the correctness or length of his sentence in his posttrial motion, defendant has waived this issue. *People v. Beals*, 162 Ill. 2d 497, 510-11, 643 N.E.2d 789 (1994). Even in the absence of waiver, there is nothing in the record to show that the trial court failed to consider appropriate mitigating factors in imposing sentence.

We affirm the judgment of the trial court. As part of our judgment, we grant the State's request and assess defendant $100 in costs for defending this appeal under *People v. Nicholls*, 71 Ill. 2d 166, 374 N.E.2d 194 (1978), and $50 for oral argument under *People v. Agnew*, 105 Ill. 2d 275, 473 N.E.2d 1319 (1985).

Affirmed.

LEAVITT, P.J., and GORDON, J., concur.