THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EDWARD MITCHELL, Defendant-Appellant.

First District (6th Division) No. 1—02—1244

Opinion filed December 3, 2004.

O'MARA FROSSARD, J., specially concurring.

Michael J. Pelletier and Steven W. Becker, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, James Fitzgerald, Alan Spellberg, and Heather Weiss, Assistant State's Attorneys, of counsel), for the People.

JUSTICE TULLY delivered the opinion of the court:

Following a jury trial, defendant, Edward Mitchell, was found guilty of first degree murder and sentenced to 100 years in prison. On appeal, defendant argues (1) that his confession should have been suppressed because it was obtained through coercion; (2) that the surveillance video from the food store where the shooting occurred should not have been admitted as the State failed to lay a proper foundation; (3) that the court improperly allowed hearsay testimony from an expert witness and that defendant's counsel was ineffective for failing to object to the testimony; (4) that he was improperly sentenced to an extended-term of imprisonment; and (5) that section 111—3(c—5) of the Code of Criminal Procedure of 1963 (725 ILCS 5/111—3(c—5) (West 2002)), which provides the procedural requirements for seeking an extended-term sentence, violates article I, section 7, of the Illinois Constitution (Ill. Const. 1970, art. I, § 7).

After the issues raised by defendant had been fully briefed, the defendant sought leave to file a supplemental brief in light of a recent appellate court decision which held that the illegal delay in arraignment of a defendant rendered his confession, given during the period of delay, inadmissible as a matter of law. We granted leave to file and the issue has been fully briefed by the defendant and the State. The State maintains that the issue of whether the defendant's fourth amendment rights were violated by a delay in holding a probable cause hearing is waived because the defendant did not raise the issue in his posttrial motion. We find that the error affects substantial

rights of the defendant and we will review this issue under the plain error rule.

The trial court conducted a lengthy hearing on defendant's motion to suppress his confession. The defendant's contention in the trial court was that mistreatment by the police caused him to make an involuntary confession. Defendant makes that same argument on appeal. In defendant's supplemental brief, however, he also argues that his confession should have been suppressed because it was obtained in violation of his fourth amendment rights under the *McLaughlin/Gerstein* rule. See *County of Riverside v. McLaughlin*, 500 U.S. 44, 114 L. Ed. 2d 49, 111 S. Ct. 1661 (1991); *Gerstein v. Pugh*, 420 U.S. 103, 43 L. Ed. 2d 54, 95 S. Ct. 854 (1975). Our discussion of the facts incorporates the testimony from the hearing on the defendant's motion to suppress as well as testimony from the trial. We focus on the evidence relevant to the fourth amendment issue.

## FACTS

On July 31, 1999, eight-year-old Paulette Peake was shot and killed while standing inside Pat's Food Store on the corner of 79th Street and Sangamon in Chicago.

Officer Ronald Spraggins of the Chicago police department responded to a call on July 31, 1999, that a child had been shot at Pat's Food Store. Officer Spraggins and his partner arrived at the scene just after 9:30 p.m. Officer Spraggins testified that a crowd had gathered outside Pat's Food Store and a woman was yelling out that she had seen three men hanging around Leo High School all evening. Leo High School is located diagonally across the street from Pat's Food Store. The woman stated that she heard the shots fired and they came from the area where the men had been hanging out all night. She gave a general description of the men, calling one of them "Kenny" and another "Mitch." Officer Spraggins went down the alley near Leo High School, where he found shell casings. He continued his search down the alley and observed the defendant jumping over a fence. Spraggins and his partner chased the defendant and arrested him in the alley. Officer Spraggins and his partner transported the defendant to the 6th District station.

At the 6th District, the defendant was interviewed by Detectives Robert Arteaga and Sylvia Van Witzenberg between 3 a.m. and 4 a.m. on August 1. The results of a gunshot residue test taken earlier were inconclusive. The interview lasted 20 to 30 minutes and the detectives told the defendant he was not being charged and he would be released from the 6th District. Detective Arteaga asked the defendant whether he would help them with the investigation and defendant agreed. The

defendant was released from the 6th District and voluntarily taken directly to Area 2.

Also on August 1, 1999, the codefendant, Kevin Johnson, was taken into custody. Kevin Johnson identified the defendant as the shooter and gave a court-reported confession. Thereafter, Detective Arteaga went to 7927 South Sangamon to recover the murder weapon.

At approximately 2 p.m. on August 1, the defendant was placed under arrest after being identified as the shooter. Detectives Van Witzenberg and Arteaga interviewed him again at Area 2 after informing him that he had been named as the shooter. Later that evening, at approximately 10 p.m., the defendant was interviewed by Assistant State's Attorney (ASA) Arunas Buntinas. That interview lasted approximately 45 minutes. ASA Buntinas interviewed the defendant again for about two hours at 4 a.m. on August 2.

On August 2 the police interviewed a witness to the shooting, Mary Lewis. On July 31, Mary Lewis was standing in front of her house at 7812 Sangamon in Chicago. Pat's Food Store is located at the end of her block and Leo High School is located diagonally across from Pat's Food Store. Mary Lewis saw the defendant and two other men standing by the corner near Leo High School. She recognized all three of the men as she had seen them before. Ms. Lewis spent most of the evening on her front stoop because she wanted to go to Pat's Foods but was waiting for the defendant and the others to "clear the corner" so she could walk down the street. At approximately 9:30 p.m., Ms. Lewis heard gunshots and saw sparks coming from the location where the defendant had been standing near Leo High School. Ms. Lewis ran into her house, put on some shoes, and then went to the corner, to Pat's Food Store. When Ms. Lewis arrived at Pat's Food Store she was yelling, "Kenny and Mitch did it."

At approximately 7 p.m. on August 2, Detectives Van Witzenberg and Arteaga showed the defendant a surveillance tape from Pat's Food. The tape showed the inside of the store at the time of the shooting. This interview lasted approximately 45 minutes. On August 2 at approximately 11:30 p.m., ASA Buntinas interviewed the defendant again for 30 to 45 minutes and continued to interview the defendant periodically throughout the night. At 2 a.m. on August 3, the detectives and ASA Buntinas again showed defendant the surveillance tape from Pat's Foods. Between 5 a.m. and 10 a.m. on August 3, ASA Buntinas periodically interviewed the defendant.

At approximately 4 or 5 p.m. on August 3, Detectives Van Witzenberg and Arteaga were notified of an outstanding warrant for the defendant in Bridgeview. At 10:30 p.m. on August 3, the detectives informed the defendant that he would be going before a judge in

Bridgeview the following morning. The detectives arranged for the defendant to call his mother to let her know he was going to Bridgeview. However, there was a problem processing the warrant so the defendant was never taken to Bridgeview and he remained in the interview room in Area 2.

On August 4, Detective Clarence Hill transported a second witness, Demetrius Jones, to Area 2 to view a lineup. On the night of the shooting when the police had arrived at the scene, Jones told one of the officers that he had seen what happened. A large crowd had gathered and the officer asked Jones to step aside while he cleared away the people. Jones waited and then decided to contact the police later as the scene was chaotic. Jones spoke to a police officer the day after the shooting while police were investigating, but he was reluctant to tell the police what he had seen because gang members were nearby. Jones told the officer that he had seen some of what happened and he gave the officer his telephone number. On August 4 at approximately 7:45 p.m., Jones viewed a lineup and identified the defendant as the man he had seen after the shooting standing behind Leo High School holding a rifle.

After the lineup, the detectives told the defendant he had been picked out and took him back to the interview room. They left him there unattended. A few minutes later Detective Van Witzenberg looked inside the room and saw the defendant cutting his wrists with a piece of metal. Detective Van Witzenberg and several others rushed in and stopped the defendant and tried to apply paper towels to the defendant's wrists. An ambulance arrived and transported the defendant to the hospital. The defendant was returned to Area 2 about three hours later, at 11 p.m., and put back in the interview room.

On August 5 at approximately 1:30 a.m., Detectives Van Witzenberg and Arteaga interviewed the defendant again for about 30 minutes. After the interview, the defendant was taken to the bathroom. As he returned to the interview room, he saw Assistant State's Attorney Torreya Hamilton sitting at a desk. The defendant stated that he wanted to speak to the ASA. ASA Hamilton interviewed the defendant twice in the early morning hours of August 5. Thereafter, at approximately 9:15 a.m. on August 5, the defendant gave his videotaped statement—the first videotaped statement ever taken in Illinois. The statement was taken 91 hours after the arrest of the defendant.

The defendant was taken before a judge for a probable cause hearing the morning of August 6, more than 115 hours after his arrest.

The trial court found that the defendant had given his statement voluntarily and denied his motion to suppress the statement. We

acknowledge that the trial judge ruled on the voluntariness of defendant's statement in light of allegations of police misconduct. We further acknowledge that testimony from the suppression hearing was elicited within the context of defendant's argument that his statement was the result of mistreatment by the police. However, the testimony is extensive and we find it sufficient for us to review whether the defendant's fourth amendment rights were violated.

## DISCUSSION

■ Under the fourth amendment of the United States Constitution, a defendant arrested without a warrant has the right to a probable cause hearing as a prerequisite to an extended restraint on liberty. *Gerstein v. Pugh*, 420 U.S. 103, 114, 43 L. Ed. 2d 54, 65, 95 S. Ct. 854, 863 (1975). The Supreme Court has held that a judicial determination of probable cause within 48 hours of arrest generally passes constitutional muster. *County of Riverside v. McLaughlin*, 500 U.S. 44, 56, 114 L. Ed. 2d 49, 63, 111 S. Ct. 1661, 1670 (1991). When a probable cause determination is not made within 48 hours of arrest, the defendant no longer has the burden to show unreasonable delay. The burden shifts to the State to show the existence of an emergency or other extraordinary circumstance. *McLaughlin*, 500 U.S. at 57, 114 L. Ed. 2d at 63, 111 S. Ct. at 1670. The Supreme Court has not fashioned a remedy for the State's failure to obtain judicial authorization for a significant pretrial detention period that violates the fourth amendment. See *Powell v. Nevada*, 511 U.S. 79, 128 L. Ed. 2d 1, 114 S. Ct. 1280 (1994).

In Illinois, the *Gerstein* rule has been codified in section 109—1(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/109—1(a) (West 1998)). While there is no separate remedy for violation of the presentment rule, Illinois courts have held that the delay is a factor to be considered when determining whether the confession was voluntary. *People v. House*, 141 Ill. 2d 323, 380, 566 N.E.2d 259 (1990); *People v. Dees*, 85 Ill. 2d 233, 237, 422 N.E.2d 616 (1981); *People v. Groves*, 294 Ill. App. 3d 570, 577, 691 N.E.2d 86 (1998).

However, this court's recent decision in *People v. Willis*, 344 Ill. App. 3d 868, 801 N.E.2d 47 (2003), *appeal allowed*, 207 Ill. 2d 627, 807 N.E.2d 981 (2004), held that a lengthy detention before any judicial intervention violated the fourth amendment and that suppression of the confession was the proper remedy. *Willis*, 344 Ill. App. 3d at 871, 801 N.E.2d at 50. The *Willis* court made a distinction between a fourth amendment analysis of a *McLaughlin* violation and a fifth amendment analysis of the violation. *Willis* acknowledged that Illinois courts have applied a fifth amendment analysis and looked at a delay in presentment of a defendant before a judge as one factor in determin-

ing whether a confession was voluntarily made. The *Willis* court, however, did not limit its analysis to the question of voluntariness of the confession. Citing *People v. Chapman*, 194 Ill. 2d 186, 215-16, 743 N.E.2d 48 (2000), the court in *Willis* reasoned that the fundamental differences between the goals of the fourth and fifth amendments required more than a determination of voluntariness. *Willis*, 344 Ill. App. 3d at 880. *Willis* determined that even if a statement is found to be voluntary, the fourth amendment issue remains and the court must determine whether the "taint" of the unlawful detention requires suppression of the statement. We agree with the reasoning of the *Willis* court.

The State argues that "decades of Illinois Supreme Court precedents" require us to consider the delay in presenting a defendant before a judge as one factor in determining the voluntariness of defendant's statement. Citing numerous cases, the State maintains that the Illinois Supreme Court "has uniformly rejected suppressing a confession solely because of a delay in providing a probable cause determination."

While we agree with the State that our supreme court has consistently considered the length of detention as one factor in determining whether a statement was voluntary, we believe that such an analysis only protects a defendant's fifth amendment right against self-incrimination. If we limit our analysis to the question of voluntariness, we fail to furnish meaningful protection from unfounded interference with liberty as required by the fourth amendment. The voluntariness test is designed to protect the fifth amendment right against self-incrimination by excluding a statement that is obtained through coercion by the police. It does not address the liberty interests implicated by a fourth amendment violation. Thus, even if the statement in this case were found to be voluntary under the fifth amendment, the fourth amendment issue remains. Accordingly, we agree with the *Willis* court that our supreme court does not require us to determine only that the statement was voluntary. We must also determine whether the defendant was illegally detained in violation of his fourth amendment rights.

■ In this case, the defendant was arrested at 2 p.m. on August 1, 1999, and presented before a judge for a probable cause determination during the morning hours on August 6, 1999—more than 110 hours later. He agreed to give a videotaped confession approximately 85 hours after his custodial detention began. The 85-hour detention before the defendant made his confession far exceeds the 48-hour period for a presumably reasonable delay. Thus, the burden falls on the State to show an emergency or extraordinary circumstance is to

blame. *McLaughlin*, 500 U.S. at 57, 114 L. Ed. 2d at 63, 111 S. Ct. at 1670.

■ Here, we find no indication in the record the delay was the result of an emergency or extraordinary circumstance. We note that on August 4 the defendant was to be taken to Bridgeview to appear before a judge on an outstanding warrant. We do not find this to be an extraordinary circumstance. First, the detectives testified that they learned of the warrant on August 3 at 4 p.m.—50 hours after the detention began. Second, the defendant was never even taken to Bridgeview, so there was no reason to delay a probable cause hearing. We also note that the defendant was transported to the hospital for self-inflicted injuries; however, this occurred 78 hours after his detention began.

We find the defendant's lawful detention became unlawful in violation of the fourth amendment to the United States Constitution after the passage of 48 hours. His confession came well after his detention became unlawful. Further, in light of our earlier analysis, we agree with the *Willis* court that "[t]he deterrent purpose of the exclusionary rule would be well served by suppression of statements that are unpurged of the primary taint created by a *McLaughlin* violation." *Willis*, 344 Ill. App. 3d at 884.

■ We now must determine whether defendant's confession is " 'sufficiently an act of free will to purge the primary taint' " of the unlawful detention. *Brown v. Illinois*, 422 U.S. 590, 598, 45 L. Ed. 2d 416, 424, 95 S. Ct. 2254, 2259 (1975), quoting *Wong Sun v. United States*, 371 U.S. 471, 486, 9 L. Ed. 2d 441, 454, 83 S. Ct. 407, 416 (1963). The *Brown* Court set forth four factors to determine whether a confession should be suppressed as fruit of the poisonous tree: (1) whether the confessor received the *Miranda* warnings; (2) the presence of intervening circumstances; (3) the temporal proximity of the arrest and the confession; and (4) the purpose and flagrancy of the police misconduct. *Brown*, 422 U.S. at 603-04, 45 L. Ed. 2d at 427, 95 S. Ct. at 2261-62. The record in this case contains sufficient information to conduct an attenuation analysis, and remand on this issue is unnecessary.

■ Here, the testimony of the detectives and the assistant State's Attorneys establishes that the defendant received numerous *Miranda* warnings. Although this factor supports admission of defendant's confession, the fact defendant received *Miranda* warnings "alone and *per se*, cannot dissipate the taint" of an illegal detention. *People v. White*, 117 Ill. 2d 194, 223, 512 N.E.2d 677 (1987); *Brown*, 422 U.S. at 603, 45 L. Ed. 2d at 427, 95 S. Ct. at 2261; *People v. Franklin*, 115 Ill. 2d 328, 337, 504 N.E.2d 80 (1987) (receiving *Miranda* warnings "on a

number of occasions" during detention was not enough to purge the taint).

Next, an intervening circumstance purges the taint of illegality by breaking the causal connection between illegal police conduct and the confession. *People v. Austin*, 293 Ill. App. 3d 784, 788, 688 N.E.2d 740 (1997). For example, the defendant might be confronted with new, legally obtained information that would produce a voluntary desire to confess. *People v. Ollie*, 333 Ill. App. 3d 971, 986, 777 N.E.2d 529 (2002). Nothing like that happened in this case. During the time defendant was detained, he was not confronted with any new evidence. The defendant was told at the time of his arrest that he had been identified as the shooter. Within 48 hours of the arrest, the police had arrested a codefendant and obtained a written statement from him, recovered the murder weapon, and taken a witness statement from Mary Lewis. The detectives showed the defendant the surveillance video from Pat's Foods which showed the victim being shot inside the store. Over the next two days, the defendant was shown this surveillance video several times. The defendant only left the interview room to use the bathroom, he used the telephone once, and he did not speak with an attorney. The only event occurring during the delay before presentment was when the defendant was taken to the hospital, which occurred after 8 p.m. on August 4, 1999—more than 78 hours after his arrest. The detention already was illegal under *McLaughlin* when defendant was transported to the hospital.

Third, the significance of the temporal proximity of the arrest and the confession depends on the particular circumstances of the case. *White*, 117 Ill. 2d at 223-24. For example, a prolonged detention between an arrest and a confession " 'may serve to amplify the coercion latent in a custodial setting.' " *Ollie*, 333 Ill. App. 3d at 985, 777 N.E.2d 529, quoting *People v. Lekas*, 155 Ill. App. 3d 391, 414, 508 N.E.2d 221 (1987). We find no intervening circumstances to explain defendant's decision to confess after numerous interviews over four days. This leads us to believe the inherently coercive nature of the 85-hour detention produced a confession that was not sufficiently an act of free will, purged of primary taint.

Finally, the purpose and flagrancy of police misconduct is a key factor in determining whether this statement is admissible. *Ollie*, 333 Ill. App. 3d at 986. In this case, the factor supports suppression. The police detained defendant without a probable cause hearing for 85 hours until he gave an inculpatory statement. With defendant's confession in hand, police presented defendant before a judge. The police had the murder weapon, the statement of a codefendant, the statement of a witness and the knowledge that a second witness had

information concerning the shooting. Although the police did not have a lineup until more than 75 hours after the defendant was arrested, this hardly qualifies as an emergency or extraordinary circumstance that would justify the violation of defendant's constitutional rights under the fourth amendment.

As our colleagues stated in *Willis*, the Supreme Court in *Gerstein* and *McLaughlin* "created a rule of prompt presentment to safeguard the rights of innocent persons, whose rights may never be litigated, from receiving unconstitutional treatment at the hands of police." *Willis*, 344 Ill. App. 3d at 887. The delay in this case is an example of the situation the Court sought to prevent. The record here fails to show any attempt by the police in this case to minimize the length of defendant's detention. On the contrary, the record demonstrates an indifference to defendant's rights and suggests the purpose of the prolonged detention was to elicit a confession.

The disregard of *McLaughlin* in this case weighs heavily in favor of suppression.

## CONCLUSION

The failure to suppress defendant's confession was reversible error. Accordingly, we reverse his conviction and remand for a new trial. After thoroughly reviewing the evidence, we are convinced that it was sufficient to support a finding of guilty beyond a reasonable doubt. Under these circumstances, a retrial of defendant would not violate double jeopardy principles. *People v. Stafford*, 325 Ill. App. 3d 1069, 1075, 759 N.E.2d 115, 120 (2001).

Reversed and remanded for a new trial.

FITZGERALD SMITH, P.J., concurs.

JUSTICE O'MARA FROSSARD, specially concurring:

I agree with the majority that delay in presenting the defendant to a judge for a *Gerstein* hearing was unreasonable. However, I agree with the State that such delay is only one factor to be considered in determining the voluntariness of a confession procured during the delay. As noted by the Illinois Supreme Court in *People v. House*, 141 Ill. 2d 323, 380 (1990), "[D]elay does not of itself vitiate a confession but is merely a factor to be considered on the question of voluntariness." The test is whether a confession has been freely and voluntarily made without compulsion or inducement or whether defendant's will was overcome at the time he confessed. *People v. Ballard*, 206 Ill. 2d 151, 177 (2002). In determining the voluntariness of a confession,

the totality of the circumstances should be considered, including, but not limited to, the following: defendant's age, education, background experience, mental capacity, and intelligence; defendant's physical condition at the time of questioning; the duration of detention; the duration of questioning; whether defendant was advised of *Miranda* rights; and whether defendant was subjected to physical or mental abuse. *Ballard*, 206 Ill. 2d at 177.

## AGE, EDUCATION, BACKGROUND EXPERIENCE, MENTAL CAPACITY, INTELLIGENCE

As to defendant's age and education, the record reflects the defendant was 23 years old with an eighth-grade education when arrested. Regarding background, defendant was an experienced felon well acquainted with the criminal justice system. He had previous convictions for armed robbery, attempted murder, unlawful use of weapon by a felon, retail theft, possession of a stolen automobile, and criminal trespass to a vehicle. At the time of his arrest, he had an attempted murder case pending in Bridgeview and he was represented by an attorney in that case. The record reflects no problem with defendant's mental capacity or intelligence.

## PHYSICAL CONDITION AT TIME OF QUESTIONING

Defendant testified he was threatened and beaten by various police officers during the repeated questioning which occurred while he was detained. For the first 100 hours of this detention, he denied involvement in the homicide. The record reflects that after 100 hours in custody, when defendant made his first incriminating statement, he had returned from Roseland Hospital, where he had received stitches to his wrist after he cut his wrist with a soda pop can. Force had been used by the police in their attempts to stop the bleeding when they first discovered him injured in interview room 3. The trial court, in addressing the use of force, indicated: "The court finds that perhaps while force was used, it may have been considered somewhat excessive, defendant was thrashing around on the floor, he was resistant, he wasn't allowing the police to help him stop the bleeding from the cut on his wrist, and there wasn't any consistency, it did not contribute to any statements he subsequently gave. Even Mitchell admits that."

The record reflects the defendant returned from the hospital on August 4, 1999, around 11 p.m., to interview room 3 at Area 2. Defendant testified that during that time, the wrist which had just received stitches was handcuffed by Detective Van Witzenberg to the ring in the interview room and he was in constant pain. Van Witzenberg refused to loosen the handcuff. Van Witzenberg denies this version of the circumstances surrounding defendant's detention before he

gave his first incriminating statement. However, what is not disputed is that 1½ hours passed until Detective Van Witzenberg returned to interview room 3, together with Detective Arteaga, at 1:30 a.m. on August 5, 1999, and again questioned defendant, at which point he gave his first incriminating statement. The credibility of Van Witzenberg and Arteaga is critical because defendant gave his first incriminating statement to them after 100 hours in custody. Van Witzenberg was the only detective present for the videotaped confession, the first given in the State of Illinois. The record reflects inherent inconsistencies in the trial judge's evaluation of the detectives' credibility.

Detective Van Witzenberg is the same detective who, together with Detective Arteaga, testified that defendant voluntarily helped the police investigate the homicide and willingly stayed in interview room 3 on August 1, 1999, with the door locked, from 6 a.m. until 2 p.m. Detectives Van Witzenberg and Arteaga testified they spoke to defendant for 20 to 30 minutes around 4 a.m. on August 1, 1999, and told him he was not going to be charged, but released. By that time witness Marie Coffey had told the police that the person she had seen running from the scene of the shooting was not defendant. Coffey identified codefendant Kevin Johnson.

Detectives Van Witzenberg and Arteaga testified that they asked defendant if he would help in the murder investigation. According to Van Witzenberg and Arteaga, defendant agreed to help the police; voluntarily accompanied them from the 6th District to Area 2 around 6 a.m.; and willingly stayed in interview room 3 for the next eight hours, with the door locked, until 2 p.m. Van Witzenberg and Arteaga testified that on August 1, 1999, at 2 p.m. defendant was told he was identified as the shooter and placed under arrest.

The trial judge found defendant's initial detention from 9:45 p.m. on July 31, 1999, to 6 a.m. on August 1, 1999, to be lawful; however, the trial judge rejected Van Witzenberg and Arteaga's version of the circumstances surrounding defendant's eight hours of detention on August 1, 1999, from 6 a.m. to 2 p.m., finding that detention unlawful. The trial judge, however, accepted their version of the circumstances surrounding defendant's continued detention from 2 p.m. on August 1, 1999, until his *Gerstein* hearing five days later on August 6, 1999, finding that detention lawful.

Van Witzenberg and Arteaga were present during defendant's repeated questioning and repeated denials for the first 100 hours of detention. They were also present for the incriminating statements made by defendant after 100 hours of detention. Their credibility is critical regarding defendant's physical condition during his lengthy detention. The record reflects inherent inconsistencies in the trial

judge's resolution of the detectives' credibility. Inconsistent credibility findings preclude deference. As such the trial judge's findings regarding testimony provided by these witnesses as to defendant's physical condition during repeated interrogation is not entitled to deference and is against the manifest weight of the evidence. See *People v. Chapman*, 194 Ill. 2d 186, 214 (2000) (where a trial court's ruling on a motion to suppress a confession involves factual determinations and credibility assessments, a reviewing court will not disturb the ruling unless it is manifestly erroneous).

## *MIRANDA* WARNINGS

The defendant was an experienced criminal well acquainted with his *Miranda* rights. It is undisputed that during the repeated interrogation which occurred during the first 100 hours of detention defendant denied participation in the homicide. Defendant testified he was aware of his *Miranda* rights and repeatedly, to no avail, asked Van Witzenberg if he could call the lawyer who was representing him on his pending attempted murder case. Van Witzenberg testified that defendant never asked to call his lawyer. As previously noted, the record reflects inconsistencies in the trial judge's findings regarding Van Witzenberg's credibility.

## DURATION OF DETENTION

As noted by the majority, *Gerstein* requires a prompt judicial determination of probable cause to arrest as a prerequisite for an extended restraint of liberty following a warrantless arrest. *Gerstein*, 420 U.S. at 114, 125, 43 L. Ed. 2d at 65, 71-72, 95 S. Ct. at 863, 868-69. Illinois has codified the *Gerstein* rule; however, the Illinois statute does not provide a remedy for its violation. 725 ILCS 5/109—1(a), 109—2(a) (West 1996). The "promptness requirement of *Gerstein*" requires probable cause determinations by neutral magistrates within 48 hours of a warrantless arrest. *County of Riverside v. McLaughlin*, 500 U.S. 44, 56, 114 L. Ed. 2d 49, 63, 111 S. Ct. 1661, 1670 (1991).

In the instant case, a judicial determination of probable cause was not made within 48 hours of arrest. Defendant made his first incriminating statement after being held in custody for 100 hours. He gave a videotaped confession after being held in custody for 108 hours. Defendant was brought to court for a *Gerstein* hearing 5½ days after arrest. When a probable cause determination is not made within 48 hours, the State has the burden of demonstrating a "bona fide emergency or other extraordinary circumstance" to explain the delay. *McLaughlin*, 500 U.S. at 57, 114 L. Ed. 2d at 63, 111 S. Ct. at 1670.

The trial court in resolving the voluntariness of defendant's confession made the following finding regarding delay:

"The length of time he was in custody with the police was not unreasonable under the circumstances, did not contribute to the statements at all, and the injury that took place to Mitchell in custody most of which were brought about by his own conduct, the cutting of the wrist, refusal to take off the clothes and put on the paper suit. If there were any injuries that were somewhat excessive, in any event, they were not contributed to in his videotaped statement."

Defendant was arrested on July 31, 1999, a Saturday, and not brought to court until July 6, 1999, the following Friday. With the exception of Sunday, Monday through Friday were regular court days during which defendant could have been presented to a judge for a *Gerstein* hearing. See *People v. Dove*, 147 Ill. App. 3d 659, 667 (1986) (court found delay not unreasonable because 2 of the 4½ days were Saturday and Sunday). The record reflects no *bona fide* emergency or other extraordinary circumstance to preclude the delay, which exceeded 100 hours, from being considered as a factor that weighs in favor of excluding defendant's confession. For the reasons articulated by the majority, the finding by the trial court that the delay was not unreasonable was against the manifest weight of the evidence.

## DURATION OF QUESTIONING

Regarding the duration of the questioning, it is undisputed that defendant was questioned repeatedly by police and prosecutors during the first 108 hours of the 5½ days he was detained before he was brought to court for a *Gerstein* hearing. The testimony of various State witnesses, including police and prosecutors, demonstrates the fact that repeated questioning of defendant occurred including, but not limited to, the following: (1) at the 6th District, around midnight on July 31, 1999, defendant was interviewed for 15 to 20 minutes by Detectives Van Witzenberg and Arteaga; (2) at 4 a.m. on August 1, 1999, Van Witzenberg and Arteaga had a 20- to 30-minute conversation with defendant at the 6th District; (3) at Area 2 on August 1, 1999, after 2 p.m., when defendant was informed he was under arrest, Van Witzenberg and Arteaga interviewed defendant for approximately 20 minutes; (4) at Area 2 on August 1, 1999, shortly before midnight, Assistant State's Attorney (ASA) Buntinas together with Van Witzenberg interviewed defendant for 30 to 45 minutes; (5) at Area 2 on August 2, 1999, at 4 a.m., ASA Buntinas together with Van Witzenberg interviewed defendant for 30 to 45 minutes; (6) at Area 2 on August 2, 1999, around 7 p.m., Van Witzenberg and Arteaga interviewed defendant for 30 to 45 minutes and viewed 3 or 4 times the video tape from the store where the victim was shot; (7) at Area 2 on August 2, 1999, around 11:30 p.m., ASA Buntinas, with Van Witzen-

berg and Arteaga, interviewed defendant for about two hours; (8) ASA Buntinas continued to interview defendant into the early morning hours of August 3, 1999, viewing the store videotape with defendant around 2 a.m. in the presence of Van Witzenberg and Arteaga; and (9) ASA Buntinas alone continued to interview defendant during a five-hour span of time on August 3, 1999, from 5 a.m. until 10 a.m. with occasional breaks in the interview. During these various interviews defendant continued to deny his involvement in the shooting.

On August 3, 1999, Arteaga told defendant that he had a warrant and defendant would be transported to Bridgeview on August 4, 1999. Defendant was allowed to call his mother around 10:30 p.m. on August 3, 1999. The fact defendant did not communicate with a family member until he was in custody for approximately 72 hours is a factor to be considered in determining the admissibility of defendant's confession. *People v. Hadnot*, 163 Ill. App. 3d 215 (1987).

By 9:30 a.m. on August 4, 1999, defendant had been in custody for 84 hours. Defendant was not transported to Bridgeview on August 4, 1999, because the warrant had not been lodged through the "LEADS" system; however, that fact does not explain why defendant was not taken to court for a *Gerstein* hearing. Defendant could have had his *Gerstein* hearing and at some later point could have been transported to Bridgeview to clear up the warrant. ASA Buntinas testified that as of August 3, 1999, defendant was not charged with anything other than the warrant.

Moreover, the warrant was generated by the instant case. The warrant was for violation of bail bond in that defendant, while on bond, committed the murder in the instant case. Not only was defendant not charged with the murder in the instant case when the warrant was issued, but defendant had not been identified in the lineup, nor had he made any incriminating statements before the warrant issued on August 3, 1999. The documents accompanying the warrant included codefendant Kevin Johnson's statement implicating defendant.

Regarding the problems with the warrant, the trial judge found as follows:

"On August 4th 2:30 in the afternoon, Mitchell was still at Area 2, and the court finds that he was still there due to a legitimate mixup about getting him out to Bridgeview. The testimony establishes to my satisfaction that the police and State's Attorney's Office did not act in bad faith in trying to get Mitchell out to Bridgeview on August 4th, but due to a problem with the Leads processing situation, the warrant was not lodged properly, and Mitchell was not taken out to Bridgeview on August 4th for a court date concerning

the violation of bail bond which was filed August 3rd before Judge Davey."

While the trial judge addressed problems with the warrant, he failed to address the lack of a *bona fide* emergency or extraordinary circumstance to explain the *Gerstein* delay. *McLaughlin*, 500 U.S. at 57, 114 L. Ed. 2d at 63, 111 S. Ct. at 1670. The record reflects no *bona fide* emergency or extraordinary circumstance to explain the delay. It is undisputed that on August 4, 1999, defendant's attorney was waiting for him at Bridgeview because the police told him they were transferring defendant to court, yet the police failed to do so. It is undisputed the police did not keep their promise that defendant would be taken to Bridgeview. *Hadnot*, 163 Ill. App. 3d at 215 (factor relied upon by court in suppressing statements was the fact that police did not keep their promise and release defendant after he passed the polygraph test).

During the time defendant was in custody, the police and prosecution repeatedly interrogated defendant and continued to attempt to gather additional evidence to justify defendant's arrest, while defendant continued to deny involvement in the homicide. *McLaughlin*, 500 U.S. at 56, 114 L. Ed. 2d at 63, 111 S. Ct. at 1670 (delay is unreasonable if for purpose of gathering additional evidence to justify arrest). It is undisputed that defendant was not charged with murder until five days of police investigation were completed while defendant was detained at Area 2, which culminated in defendant's videotaped confession at 9 a.m. on August 5, 1999. It is undisputed defendant was repeatedly questioned at Area 2 during those five days.

Regarding the homicide investigation, the record reflects that Detective Hill had information as early as August 1, 1999, that Demetrius Jones was a witness. Hill had contact with Jones on August 1, 1999, sometime between 9 a.m. and noon, when Demetrius Jones told Hill that "Mitch and his boys" did the shooting. That information conflicted with information provided by Marie Coffey at 1:30 a.m. on August 1, 1999, that the person running from the scene was not defendant. However, Demetrius Jones was not taken to Area 2 on August 1, 1999, to view defendant in a lineup, even though defendant was detained in interview room 3 at Area 2 at that time.

Detective Hill next had contact with Demetrius Jones three days later during the afternoon of August 4, 1999. During those three days defendant was detained in interview room 3 at Area 2 and repeatedly interrogated by the police and prosecution. On August 4, 1999, Hill notified Area 2 between 1 p.m. and 2 p.m. that he had a witness to view defendant in a lineup. By that time defendant had been in custody 88 hours. It was not until 94 hours after being held in custody, at 7:45

p.m. on August 4, 1999, that defendant participated in a lineup conducted by Van Witzenberg and Arteaga and viewed by Demetrius Jones. Defendant was identified by Jones, returned to interview room 3, and informed by Detective Arteaga of the identification. Shortly thereafter defendant cut his wrist with a soda pop can.

The court's finding of fact that defendant confessed because he was identified in the lineup is contradicted by the evidence. Shortly after being told he was identified in the lineup, defendant did not confess; rather, he cut his wrist with a pop can. Defendant's first incriminating statement, at 1:30 a.m. on August 5, 1999, did not occur until six hours after he was told he was identified in the lineup. Upon returning from the hospital, defendant was again placed in interview room 3. Defendant testified that Van Witzenberg cuffed his injured wrist to the ring on the wall in interview room 3, causing constant pain, and refused to loosen the handcuff; however, Van Witzenberg denies doing that. The trial court resolved this credibility question in favor of Van Witzenberg. As noted, the trial court made inconsistent findings regarding the credibility of Van Witzenberg. For the reasons previously discussed, the trial judge's finding regarding Van Witzenberg's credibility is not entitled to deference and is against the manifest weight of the evidence.

PHYSICAL OR MENTAL ABUSE OR LATENT COERCION

Defendant received stitches at Roseland Hospital and by 11 p.m. on August 4, 1999, he was returned to interview room 3 at Area 2. Defendant testified he was repeatedly threatened, beaten and told he would be held indefinitely if he did not confess. Every witness produced by the State denied these allegations. Disregarding defendant's testimony that he was told he could be held indefinitely, and disregarding his testimony that he was physically and mentally abused by various officers, the length and circumstances surrounding the detention, including defendant's persistent denial, are factors to be considered regarding the admissibility of his confession. By 11 p.m. on August 4, 1999, when defendant was returned to interview room 3 from Roseland Hospital, he had been in custody 98 hours. After cutting his wrist and returning from the hospital, where he had received stitches, he was not taken to the lockup for transportation to court the morning of August 5, 1999, but returned to interview room 3 at 11 p.m. for further questioning by Van Witzenberg.

Questioning of defendant did not take place immediately; rather, he testified that he was left in interview room 3 with his injured wrist handcuffed to the ring. As previously noted, that fact is disputed; what is not disputed is that defendant, with the exception of being

photographed to preserve the lineup, was left in interview room 3 for 1½ hours, until Van Witzenberg with Arteaga resumed *interrogation* at 12:30 a.m. on August 5, 1999. At this point, defendant had been in custody for 100 hours and he made his first incriminating statement. Prolonged detention between arrest and confession " 'may serve to amplify the coercion latent in a custodial setting, particularly when there are other indicia of coercion.' " *People v. Ollie*, 333 Ill. App. 3d 971, 985 (2002), quoting *People v. Lekas*, 155 Ill. App. 3d 391, 414 (1987).

After Van Witzenberg completed her questioning, ASA Hamilton had a short 5-minute discussion with defendant followed by a 45-minute interview with Van Witzenberg present. During the early morning hours of August 5, 1999, ASA Hamilton spoke to defendant at various times before the 9 a.m. videotaped confession was given by defendant. The videotaped confession was taken at 9 a.m. on August 5, 1999, which was eight hours after defendant's first incriminating statement to Van Witzenberg. At that point defendant had been in custody 108 hours. During the first 100 hours that defendant had been in custody, it is undisputed that he had been questioned repeatedly and he repeatedly had denied his involvement in the shooting. He had also been treated at the hospital for self-inflicted wounds and then returned to interview room 3, where 1½ hours later interrogation resumed at 12:30 a.m. on August 5, 1999. Repeated interrogation and persistent denial are factors to be considered in determining the admissibility of defendant's confession. *People v. Travis*, 170 Ill. App. 3d 873 (1988).

This was not a case where a defendant began making incriminating statements the moment he entered the station, or even several hours after being questioned at the police station; rather, the defendant in this case confessed after interrogation which took place over a period of 100 hours. *In re Lamb*, 61 Ill. 2d 383, 388 (1975) (where first oral admission occurred 16 hours after arrest and written statement was made 26 hours after arrest, totality of circumstances did not justify suppression of confession); *House*, 141 Ill. 2d at 380 (where last inculpatory statement was made after 37 hours, totality of circumstances did not require suppression); *People v. Nicholls*, 42 Ill. 2d 91, 101 (1969) (no suppression where confession was made after 34 hours); *People v. Carter*, 39 Ill. 2d 31, 38 (1968) (no suppression where confession was made after 32 hours).

With the exception of receiving treatment at Roseland Hospital and the lineup, defendant remained in the same interview room at Area 2 until he was taken for the *Gerstein* hearing on August 6, 1999. For a period of 100 hours, until August 4, 1999, at 1:30 a.m., defendant

denied involvement in the shooting. This fact was noted by the trial judge: " 'All of the statements up to the time pretty close to the videotaped statement was basically, "I wasn't there, I didn't do it, no knowledge of the homicide," or whatever ***.' " However, the trial judge did not find that this undisputed fact contradicted the testimony of police and prosecutors that defendant confessed freely and voluntarily.

The record reflects that defendant failed to engage in an ongoing dialogue providing information about the homicide to the detectives. See *People v. Groves*, 284 Ill. App. 3d 570, 578-79 (1998). In *Groves* the court relied on the totality of the circumstances, including the voluntary dialogue between the defendant and police in which the defendant provided information for police to further investigate, in finding the four-day presentment delay reasonable and the confession voluntary. The record in the instant case reflects no such voluntary dialogue, but rather, a persistent denial by defendant for 100 hours.

In *People v. Travis*, 170 Ill. App. 3d 873, 886 (1988), the defendant was held in custody for four days and claimed he was repeatedly interrogated, rendering his confession involuntary. The court rejected this argument because the defendant began making incriminating statements the moment he entered the station. *Travis*, 170 Ill. App. 3d at 886. However, the court noted as follows: "If defendant had not spoken until the last day, his position might have more merit. However, defendant began speaking promptly, and in each subsequent interrogation, after waiving his rights, gave more incriminating information." *Travis*, 170 Ill. App. 3d at 886. The record reflects the opposite is true in the instant case, where defendant persisted in denial providing no incriminating information for a period of 100 hours under repeated interrogation.

## CONCLUSION

The hearing regarding the voluntariness of defendant's confession took place over a period of 9 months and generated over 900 pages of testimony from 18 witnesses. The trial together with the hearing generated 12 volumes of transcripts and numerous exhibits, including defendant's videotaped confession. A review of this record reflects the trial judge was manifestly erroneous in denying suppression of defendant's confession based on the totality of the circumstances, including, but not limited to, the following: (1) the length of the delay in taking defendant to court for a *Gerstein* probable cause hearing; (2) the failure of the State to demonstrate any *bona fide* emergency or other extraordinary circumstance for the delay; (3) the nature, extent, and duration of repeated questioning by police and prosecution; (4)

defendant's physical condition at the time of questioning; (5) defendant's denial, which persisted for 100 hours; (6) the trial court's inconsistent credibility findings; and (7) the trial court's findings of fact, which were contradicted by the record.