First Division

May 2, 2005 

No. 1-03-3285

THE PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Appellee,

v.

DORIS STERLING,

Defendant-Appellant.

)

)

)

)

)

)

)

)

)

)

Appeal from 

the Circuit Court 

of Cook County

00 CR 12822

Honorable 

Preston L. Bowie

Judge Presiding

JUSTICE McBRIDE delivered the opinion of the court:

In June 2003, a jury found defendant, Doris Sterling, guilty of the February 2000 first degree murder and robbery of Antoinette Strong.  At the sentencing hearing, the trial court found defendant eligible for the death penalty, but instead sentenced defendant to 70 years’ imprisonment for the murder and a 14-year extended-term sentence for the robbery.

Defendant appeals, arguing that (1) he was denied effective assistance of counsel because his trial counsel failed to make a motion to suppress statements made to police while detained for 96 hours; (2) the trial court abused its discretion because it allowed several crime scene and autopsy photographs and the autopsy report to go into the jury room during jury deliberations; (3) the trial court erred by imposing a 70-year extended-term sentence for first degree murder because it did not make a finding on the record that an extended term was warranted; (4) the extended-term sentence for robbery is void because an extended term may only be imposed on the most serious class of conviction; and (5) the mittimus must be amended to include an additional 52 days of credit for time served in custody.

On February 24, 2000, the body of Antoinette Strong was discovered in a partially abandoned public housing complex at 519 East 38th
 
Place in Chicago.  Strong was last seen by her family on February 21, 2000, at around 10:15 p.m. when she left her home with defendant to go buy drugs.  The following evidence was admitted at defendant’s trial.

Detective Martin Darcy testified that he is a homicide detective assigned to Area 1 in the City of Chicago.  On February 24, 2000, Detective Darcy received the assignment to investigate a homicide at 519 East 38th
 Place.  When he arrived at the scene, Detective Darcy went to the southeast bedroom on the third floor.  Detective Darcy observed a black female lying on her back on the floor.  She was nude with a chair placed on top of her.  Detective Darcy described the chair as a wooden kitchen chair and the seat was lying on the victim’s neck.  Detective Darcy saw that the areas around the victim’s mouth and left shoulder were burned.  There was some material on top of her face that was charred and ash.  Detective Darcy also observed that there was extensive burning on the victim’s thighs and vaginal area.  Again, there was some material on top of the vaginal area that was charred and ash.  Detective Darcy noticed that there was a shoelace around the victim’s neck and partly lying across her chest between her breasts.

Detective Darcy stated there was a pile of clothes near the victim and trash was strewn about the room.  The room had two windows that were boarded up, but one board had been removed and was lying near the victim.  The medical examiner was called to the scene as was the Chicago police crime lab and the FBI.  

On cross-examination, Detective Darcy stated that he did not know when the homicide took place.  He was only aware of when the body was discovered.  On redirect examination, Detective Darcy stated that a citizen reported the body to the police on the morning of February 24, 2000.

Special Agent Daniel Cain testified that he is employed as special agent for the FBI.  He was assigned to an evidence response team that processes crime scenes in order to collect evidence.  On February 24, 2000, he was part of an evidence response team called to a scene at 519 East 38th
 Place.  When his team arrived on the scene, they spoke with the Chicago police on site.  The team walked through the crime scene to observe evidence.  Cain was assigned as a searcher at the scene.  He was searching for anything that might contain evidence of value, specifically, fingerprints, DNA, and possible hairs and fibers.  Cain’s team recovered approximately 40 items, including several cans and bottles.  Cain also observed a deceased female nude on the floor with a chair positioned over her neck, and burned remains were over the face and pelvic area.

Cynthia Engelking-Prus testified that she is employed at the Illinois State Police Forensic Science Center as a forensic scientist specializing in latent prints.  She performs tests to compare the ridges of the skin left on an object with an intentional ink print of a person’s fingerprints, and a latent print, which is usually invisible.  She worked as a fingerprint analyst on the homicide investigation of Strong.  In the course of her investigation, she found fingerprints suitable for comparison on a “Wild Irish Rose” bottle that was recovered from the murder scene.  She compared the fingerprints from the bottle with an ink card of fingerprints belonging to defendant.  She concluded, in her opinion to a reasonable degree of scientific certainty, one of the latent impressions on the bottle was made by defendant.  Four other items were sent for fingerprint comparison as well, but they did not contain fingerprints matching defendant’s.  Two of the other eleven fingerprints were matched to other individuals, and the other nine were not matched.  

Anthony Strong testified that he is the brother of Antoinette Strong.  He also has another sister, named Angela Strong.  In February 2000, Anthony was living with both Antoinette and Angela.  On February 21, 2000, he was home with Antoinette and one of her three sons.  Angela arrived home later.  A person called Quake came over to the house.  Anthony identified Quake as defendant.  Anthony had known defendant for about a year because he was friends with Angela and Antoinette.  Defendant left with Antoinette at around 10:15 p.m.  Anthony did not see Antoinette again.  Defendant came over early the next morning and asked for Antoinette because she owed defendant money.  

On February 24, 2000, Anthony heard that a body was found and he had a feeling it was his sister.  Anthony went to the police and told them what he knew about the last time he saw her.  Anthony also testified that Antoinette was receiving public assistance on the 21st
 of every month through a “Link card,” which operates like a credit card or cash card.  

On cross-examination, Anthony testified that he knew Antoinette used marijuana, cocaine and heroin.  He thought she had a problem with drugs.  

Detective Glenn Mathews testified that he is employed as an Area 1 detective with the Chicago police department.  Detective Mathews was assigned to Strong’s homicide on February 24, 2000.  He worked with Detective Van Beveren on that date.  His responsibility was to do the follow-up investigation in which he and Detective Van Beveren went to the residents near the crime scene and asked if they saw or heard anything that might be related to the investigation.  The canvas of nearby residents did not produce any residents.  Detective Mathews followed a lead on Strong’s Link card.  A Link card is a public aid card that gives an individual a certain amount of cash and food stamps.  Detective Mathews followed this lead because he knew Strong had one, but the police had not located it.  The Link card was never recovered.  On March 21, 2000, the police were told by “public aid” that there had been no activity on the card.  However, on March 28, 2000, the police were informed that there had been activity on the Link card.  Someone had taken the full grant of cash and food stamps.  The money was $414.  Detective Mathews learned the location of the currency exchange where the Link card was used.  They were directed to a bank to get the money order, which the police were able to retrieve.  The money order was used to retrieve Strong’s funds and had defendant’s signature on the back for an endorsement.  

Detective Mathews contacted the Illinois State Police crime lab to see if a handwriting analysis could be done with the money order and defendant’s signature on the DNA consent form.  However, the analyst at the crime lab told the police she did not have enough samples to make a comparison.

Detective Mathews picked up defendant on April 20, 2000, for additional questioning and advised him of his 
Miranda
 warnings.  Detectives Evans and Van Beveren were also present.  During the questioning, Detective Mathews asked defendant if he would consent to a handwriting analysis.  The analysis consists of a preprinted form with various samples of writing to be completed, such as copying over entire paragraphs and writing specific words and names.  Defendant completed the handwriting sample form and it is part of the record on appeal.  Each page of the form was signed by defendant and Detective Mathews, who also wrote the time and date as April 20, 2000, at 11:21 p.m.   

On cross-examination, Detective Mathews stated that defendant was not free to leave the police station on April 20.
  Detective Mathews also stated that identification is not required to use a Link card and the card does not have a printed name on it.

Detective David Evans testified that he is employed with the Chicago police department and assigned to Area 1.  Detective Evans became involved with the homicide investigation on March 21, 2000.  He was asked by Detectives Joy Van Beveren and Glenn Mathews to assist them in obtaining a buccal swab from an individual they wanted to question about the homicide.  Detective Evans spoke with defendant at Area 1.  He did not give defendant his 
Miranda
 rights because there was nothing indicating defendant was a suspect in the investigation at that time.  Defendant told Detective Evans that he saw Strong get into a gentleman’s car and that was the last time he saw her.  Defendant said he was friends with Strong and he did not have any sexual contact with her.

A buccal swab is used to conduct DNA analysis.  The test consists of a technician inserting a swab similar to a Q-Tip inside the gum line to absorb saliva onto the swab.  Defendant signed a consent form for the swab.  At that point in the investigation, the police were trying to eliminate defendant as a suspect.  After the swab, defendant was driven home by the police and released.

Detective Evans testified that defendant voluntarily came into Area 1 on March 25.  Defendant came in to view a lineup of an individual the police had arrested for possession of narcotics in his car.  The car matched the description defendant had given for the car he said Strong got into on the night of February 21.  Defendant said the individual arrested was not the person he was talking about.  Defendant left Area 1.

Detective Evans spoked with defendant again on April 20, 2000, at about 2:15 p.m. at Area 1.  Detective Van Beveren and Detective Mathews were also present.  Detective Evans stated that defendant was brought in on April 20 because earlier that day he received the results of the DNA analysis and the semen found in Strong’s mouth matched defendant.  Defendant was given his 
Miranda
 rights.  Defendant agreed to speak with the police.  Defendant told police that he saw Strong get into another person’s car and she was supposed to meet him a couple minutes later at another location.  Defendant denied having any sexual contact with Strong.  However as pointed out above, Detective Evans testified that the DNA testing results received that day showed that there was semen found in Strong’s mouth and the DNA from the semen matched defendant.  They continued to question defendant and he admitted to having “freaky sex” with Strong days prior to February 21
.  Later, defendant changed his statement to say that he had sex with Strong and he knew who killed her.

Detective Evans and Detective Mathews questioned defendant again at midnight on April 21
.  Defendant was again advised of his 
Miranda
 rights.  The police were going to end their investigation for the night when defendant stated that he would like to talk to them.  Defendant changed his story and said that he knew who killed Strong and was ready to talk about those circumstances.  Defendant said that a man named Richard, identified as Richard Smith, a man named Toby, and a man called D-Man or D-Dog committed the homicide.  At first, defendant denied being present during the crime, but defendant later changed his story.  After each of defendant’s statements, the police would try to investigate the information defendant gave them.  

On cross-examination, Detective Evans stated that defendant was not in handcuffs or being restrained when Detective Evans first saw defendant on April 20.
  Detective Evans said that defendant was not under arrest the evening of April 20 and into the morning hours of April 21, but he remained at Area 1 because he was cooperating with police and the police were following defendant’s leads, specifically, defendant gave the police “different stories about offenders, possible other offenders in this case.”  Detective Evans went home in the early morning hours of April 21 and returned for work later that morning. 

At around 10:45 a.m. on April 21,
 defendant identified in a photo array two of the three individuals he said committed the crime.  The police followed up on those individuals and on other statements made about possible corroborating individuals.  The corroborating individuals were “girlfriends and girlfriends of the alleged other offenders.”  These leads did not progress anywhere.  Detective Evans also stated that defendant admitted he was present during the homicide at this time. 

At about 10 a.m. on April 22
, Detective Evans spoke with defendant again.  At this time, defendant admitted to being present at and involved in Strong’s homicide.  Defendant admitted he set up Strong. 

Jean Brundage testified that she is employed as questioned document examiner with the Illinois State Police crime lab.  A questioned document examiner analyzes and compares handwriting, handprinting, alterations, and basically any physical aspects of a document.  She conducted handwriting analysis on a money order in this case.  Originally, she was asked to compare the money order with one known signature, but that was insufficient for her analysis.  She later received additional handwriting samples from defendant for her analysis.  Based on her analysis, Brundage formed an opinion that defendant did write the endorsement on the money order.  

Mary Margaret Greer-Ritzheimer testified that in 2000, she was a forensic scientist in the biochemistry section of the Illinois State Police Forensic Science Center.  Her primary duties included examining evidence for the presence of biological fluids such as blood and semen.  She also could perform DNA profiling.  In March 2000, she received a blood standard from Strong as well as oral swabs of semen.  Greer-Ritzheimer found two DNA samples on the oral swabs, one was identified as Strong and the other was male DNA.  She later received a saliva standard from defendant.  She compared the known DNA profile of defendant with the unknown DNA profile from the oral swabs of Strong.  Greer-Ritzheimer’s conclusion was that the DNA profile from defendant matched the unknown male DNA profile from the oral swabs from Strong.  Her conclusion was that this DNA profile would be expected to occur in approximately 1 in 81 quadrillion blacks, 1 in 270 quintillion whites, and 1 in 180 quintillion Hispanics.

On cross-examination, Greer-Ritzheimer stated that male semen from a female oral swab would not last longer than 72 hours.

Dr. John Scott Denton testified that he is a deputy medical examiner with the Cook County medical examiner’s office.  He received the body of Strong on February 25, 2000, for an autopsy.  He stated that the cause of death was strangulation. He also determined that the fires that burned her face and vaginal area were set after her death.  He could not state an exact time of death.  The autopsy report indicates the presence of cocaine in Strong’s body at the time of her death.

Assistant State’s Attorney (ASA) Tom Driscoll testified that he is a felony trial assistant with the Cook County State’s Attorney’s office.  In April 2000, Driscoll was assigned to the felony trial unit of the State’s Attorney’s office.  In that unit, attorneys are available 24 hours a day.  On April 23, 2000, Driscoll received an assignment at Area 1.  He got the assignment shortly before 11 a.m.  When he arrived at Area 1, Driscoll spoke with the detectives on the investigation about the information they had on the case.  Driscoll met with defendant at that time.   Driscoll advised defendant of his 
Miranda
 rights and told defendant that Driscoll was not his attorney and Driscoll was there working with the police.  Defendant agreed to speak with Driscoll.  

Driscoll then conducted a lengthy question-and-answer interview.  During the interview, defendant did not indicate that he was unwilling to talk and continued to respond to questions.  At some point during the interview, defendant’s lunch arrived and they took a break.  When the two men were alone, Driscoll asked defendant how he was being treated by the police.   Defendant told Driscoll that the police treated him “professionally, fairly and extremely reasonably” and defendant had no complaints.  Driscoll asked defendant if he would like to memorialize his statement.  Defendant agreed to a handwritten statement.  Driscoll began to take defendant’s statement at 5 p.m.  Defendant’s statement consisted of 14 pages written by Driscoll.  When they finished, Driscoll went over the statement with defendant to make sure defendant could read Driscoll’s handwriting and to make sure all the details were correct.  Defendant, Driscoll, and Detective Evans reviewed and signed each page of the statement.

Driscoll read defendant’s statement into the record.  Defendant stated he was 26 years old.  He joined the Gangster Disciples when he was 12 years old and rose to the rank of chief enforcement officer when he was 16.  As chief enforcement officer, defendant made sure members of the gang enforced the rules.  He “violated” members who did not follow the rules, and these “violations” included beating up members.  In August 1999, someone else took over defendant’s job and he became a consultant for the gang.

Defendant met Strong about 10 months prior to the murder.  Defendant described his relationship with Strong as a “semi-friend” whom he had sex with and did cocaine with at times.  Defendant stated that on February 18, 2000, Strong asked defendant if he knew where she could get a half ounce of cocaine.  Strong said she wanted to buy the cocaine on February 21, 2000, when she would receive her Link card money.  Defendant said a half ounce cost between $400 and $500 on the street.  Defendant told Strong he could get her the cocaine.

On February 19, 2000, defendant met with Toby, whom defendant knows as the governor in the Gangster Disciples.  Defendant asked Toby if he had a half ounce of cocaine to sell to a customer.  Toby told defendant he did and to contact him when he had the money.  

On February 21, 2000, defendant spent the day with Antoinette, Anthony and Angela Strong.  Around 7 p.m., Strong asked defendant if he had set up the cocaine purchase, and defendant told her yes.  Defendant left around that time to look for Toby.  Defendant asked someone to have Toby page him.

Defendant went to his girlfriend Jamesetta’s apartment at around 10:15 p.m.  Toby came over to Jamesetta’s building and defendant talked to him.  Toby asked who the cocaine was for and defendant told him it was for Strong.  Toby told defendant that he is “fittin to kick that whore’s ass.”  Defendant asked why, and Toby responded that Strong had “ripped off” some dope of Toby’s and owed him money.  Defendant told Toby that Strong did not know where the cocaine was coming from.  Defendant asked where to bring Strong for the “ass whupping.”  Toby told defendant to take Strong to “the tip.”  “The tip” is an apartment at 519 East 38th
 Place where the Gangster Disciples bring people to be “violated.”  Defendant said that the “violation” would be physical punishment.  Defendant told Toby to page him in a little while.  Toby left and defendant left shortly thereafter.

Defendant later went to the Strong’s house and stayed for about 15 minutes.  Defendant and Strong left at about 11:50 p.m.  Defendant got a page from Toby, which contained a number that indicated it was an emergency call from a Gangster Disciple.  Defendant and Strong walked to a convenience store and defendant returned Toby’s page.  Toby asked whether defendant had arranged to take Strong to “the tip” and asked how long it was going to be.  Defendant told Toby he was taking Strong to “the tip,” but it would be about an hour until they got there.  Defendant told Toby an hour because defendant wanted to get high and engage in oral sex before Toby arrived.  

As defendant and Strong walked to “the tip,” they saw Frank, who was driving a black Buick.  Frank and Strong talked and Strong told defendant she wanted to go with Frank.  Defendant told Strong he had business with her.  Frank drove defendant and Strong to the corner of 39th
 and Rhodes.   Frank asked defendant where they were headed and defendant said “the tip.”  Frank gave defendant a look that indicated to defendant that Frank would tell Toby where they were.  

Defendant and Strong arrived at “the tip” around 12:15 a.m.  Defendant took Strong up to the second floor.  Defendant and Strong started smoking cocaine.  Defendant asked Strong if they could do something, meaning sex.  Strong said yes and got completely undressed.  Defendant did not wear a condom.  Defendant and Strong had oral sex twice, and defendant ejaculated into Strong’s mouth.  When they were having oral sex for the third time, Toby walked into the room with Richard and D-Mack.  Defendant had his pants at his ankles and a cocaine pipe in his hand.  Toby said, “Bitch, I told you I would catch up with you,” and to defendant, “Quake, are you getting high?”  Richard told defendant to pull up his pants because he looked stupid.  Defendant said his nickname is Quake.

Toby asked Strong where was the money, and Strong said she did not have any money.  Strong looked at defendant and said “you knew.”  Defendant took this to mean that he knew that Strong owed Toby and Toby was coming for her.  Defendant told Strong he was sorry.

Strong got up from the chair she was sitting on and Richard hit her in the chest with his hand.  Strong fell into the wall.  Richard punched Strong on the side of the head a couple times, knocking her to the ground.  Toby asked defendant where Strong’s cash was.  Defendant told him it was in her clothes.  Richard started to choke Strong with his hand.  Defendant found Strong’s money in her boot pocket.  Richard took the money from defendant and counted it.

Strong got up and walked toward the door where D-Mack was standing.  Toby told defendant to grab her.  Defendant hesitated and Strong ran past him.  D-Mack pushed Strong back toward defendant.  Defendant grabbed her by the back of her hair and yanked her toward the floor.  She fell to the ground, hitting the back of her head.  She got on all fours on the floor and was crying.  

Richard took a shoelace out of Strong’s boot.  Richard straddled Strong and made a loop out of the lace.  He crossed his hands and placed the loop around Strong’s neck.  Richard pulled both ends of the shoelace at the same time, choking Strong.  Richard stood up, pulling Strong’s hands off the ground.  Strong tried to grab Richard’s hands.  Richard continued to pull on the shoelace, causing Strong to stand up.  Toby told defendant to grab her hands, and when defendant hesitated, Toby told defendant he was getting soft.  Toby grabbed Strong’s hands and held them while Richard continued to choke her.  Defendant said that Richard choked Strong for about five minutes before her body went limp.  Richard dropped Strong to the ground on her back.

Richard stood on top of Strong, putting one foot on her chest and one foot on her neck.  Richard told defendant he was “going soft” and asked how long defendant had been smoking cocaine.  Toby told defendant he is out because it is against the rules for Gangster Disciples to use drugs.

Defendant heard gasping sounds from Strong.  Richard picked up the chair and placed the seat of the chair on Strong’s neck and sat on it.  Richard, while looking at defendant, said this is how you kill someone.  Toby told defendant to sit on the chair.  Richard told defendant to think of it this way, “if she is still alive, what do you think she is going to tell people, that you tried to kill her?”  Defendant walked over to Strong and sat on the chair.  Defendant noticed she was no longer moving or gasping.  

Richard asked for a lighter from defendant.  Defendant gave Richard a lighter and Richard picked up a paper bag and lit it.  He dropped the paper bag on Strong’s vaginal area.  Richard picked up a shirt or pants and lit it on fire.  He dropped it on Strong’s face.  

Defendant moved to the corner of the room.  Richard told defendant “it would be advised that [he] kept [his] mouth shut.”  Toby told defendant to remember that nobody saw them with Strong; people just saw defendant with her.  Richard, Toby and D-Mack left.  Defendant stayed for about five more minutes because he wanted to see if she would move.  

Defendant left and went to his godsister’s house.  He smoked marijuana and drank alcohol.  At about 1:30 a.m., defendant went to Strong’s apartment and told her sister that the last time he saw her, Strong was getting into a black car with a man named Frank.  He also told her that he gave Strong $20 for cigarettes and liquor and to have Strong bring him the money or cigarettes and liquor when Strong got home.  

Later, defendant went back to 519 East 38th
 Place to see if he left any of his property.  Defendant looked through the room and found Strong’s Link card and a bracelet, which he took.  Defendant left.   Defendant said he used Strong’s Link card to get $414 in cash and cashed in $165 of the food stamps.

At the end of defendant’s statement, he told Driscoll that he was not under the influence of alcohol and drugs.  Defendant gave the statement freely and voluntarily.  Defendant said the officers treated him fairly.  Defendant stated that he has been given a variety of food while at Area 1, such as, hamburgers, sausage and biscuits, chicken, and a Subway sandwich.  Defendant was also given multiple packs of cigarettes.  Defendant said that he slept six to eight hours each night.  Defendant was able to take bathroom breaks when requested.  He came to Area 1 on April 20 voluntarily to cooperate in Strong’s homicide investigation.

Following Driscoll’s testimony, the State rested.  Defendant moved for a directed verdict, which the trial court denied.  Defendant rested without offering any additional evidence.  During the jury instruction conference, defendant’s attorney made an oral motion regarding the suppression of defendant’s statements given at the police station and cited to “
Riverside v. California
” (
County of Riverside v. McLaughlin
, 500 U.S. 44, 114 L. Ed. 2d 49, 111 S. Ct. 1661 (1991)).  Suggesting that the motion should be denied, the State argued that defendant implicated himself within a day.  Defendant’s attorney countered that defendant was a suspect, in custody and under arrest, and held for three days before making a statement.  The court agreed with the State that defendant implicated himself within a day based on the testimony it heard and denied the motion.  We should also note that defendant’s attorney filed a formal written motion prior to trial seeking to suppress the DNA evidence, specifically, the buccal swab.  After a hearing in which several witnesses testified, the court denied that motion.  Following jury deliberations, defendant was found guilty of first degree murder and robbery.  At a July 2003 hearing, the trial court sentenced defendant to 70 years’ imprisonment for first degree murder and 14 years for robbery.  Defendant was given credit for 1,142 days served in custody.  

This appeal followed.

Defendant initially argues that he was denied effective assistance of counsel because his attorney failed to file a motion to suppress statements made to police over the course of defendant’s detention.  Specifically, defendant contends that he was deprived of his fourth amendment rights because the police illegally obtained statements over the course of defendant’s 96-hour detention before a probable cause hearing, and his trial counsel was ineffective for failing to file a motion to suppress such statements.  The State asserts that defendant cannot satisfy either prong of the test in 
Strickland v. Washington
, 
466 U.S. 668, 80 L. Ed. 2d 674, 
104 S. Ct 2052 (1984). 

In 
Strickland
, the Supreme Court delineated a two-part test to use when evaluating whether a defendant was denied the effective assistance of counsel in violation of the sixth amendment.  Under 
Strickland
, a defendant must demonstrate that counsel's performance was deficient and that such deficient performance substantially prejudiced defendant.  
Strickland
, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.  If a case may be disposed of on the ground of lack of sufficient prejudice, that course should be taken, and the court need not ever consider the quality of the attorney's performance.  
Strickland
, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.  In evaluating sufficient prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  
Strickland
, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

In order to prove ineffective assistance of counsel, defendant must overcome the presumption that the challenged conduct might be considered sound trial strategy under the circumstances.  
People v. Giles
, 209 Ill. App. 3d 265, 269 (1991).  The question of whether to file a motion to suppress evidence is traditionally considered a matter of trial strategy, and to prevail on a claim that trial counsel is ineffective by failing to file a motion to suppress, defendant must show that the motion would have been granted and that the trial outcome would have been different if the evidence had been suppressed.  
People v. Rodriguez
, 312 Ill. App. 3d 920, 925 (2000).  Neither mistakes in strategy nor the fact that another attorney with the benefit of hindsight would have handled the case differently indicates the trial lawyer was incompetent.  
People v. Young
, 341 Ill. App. 3d 379, 383 (2003).  A decision that involves a matter of trial strategy will typically not support a claim of ineffective representation.  
People v. Simmons
, 342 Ill. App. 3d 185, 191 (2003).  Defense counsel is not required to make losing motions or objections in order to provide effective legal assistance.  
People v. Kelley
, 304 Ill. App. 3d 628, 636 (1999). 

The record indicates that defendant was present at Area 1 for questioning from Thursday, April 20, 2000, at about 2:15 p.m., until his probable cause hearing on Monday, April 24, 2000.  Defendant claims that this delay in his probable cause hearing was unreasonable and violated defendant’s fourth amendment right to a prompt hearing.  Defendant asserts that there is a reasonable probability that a motion to suppress defendant’s statements would have been granted because such statements were obtained in violation of defendant’s fourth amendment rights.  

Under the fourth amendment of the United States Constitution, a defendant arrested without a warrant has the right to a probable cause hearing as a prerequisite to an extended restraint on liberty.  
People v. Groves
, 294 Ill. App. 3d 570, 577 (1998).  After a warrantless arrest, the State must provide defendant with a prompt determination of probable cause by a neutral, detached magistrate.  
Gerstein v. Pugh
, 420 U.S. 103, 43 L. Ed. 2d 54, 95 S. Ct. 854 (1975).  The Supreme Court has held that a judicial determination of probable cause within 48 hours of arrest generally passes constitutional muster.  
County of Riverside v. McLaughlin
, 500 U.S. 44, 56, 114 L. Ed. 2d 49, 63, 111 S. Ct. 1661, 1670 (1991).  When a probable cause determination is not made within 48 hours of arrest, the defendant no longer has the burden to show unreasonable delay.  The burden shifts to the State to show the existence of an emergency or other extraordinary circumstance. 
McLaughlin
, 500 U.S. at 57, 114 L. Ed. 2d at 63, 111 S. Ct. at 1670.  
We note that the Supreme Court has declined to specify a remedy for a 
McLaughlin
 violation, leaving it to the states.  
Powell v. Nevada
, 511 U.S. 79, 84-85, 128 L. Ed. 2d 1, 7-8, 114 S. Ct. 1280, 1283-84 (1994).  Recent Illinois decisions have found suppression of the statements under the exclusionary rule to be the appropriate remedy, but the Illinois Supreme Court had not yet spoken on this issue.  See 
People v. Willis
, 344 Ill. App. 3d 868 (2003)
; 
 
People v. Mitchell
, 354 Ill. App. 3d 396 (2004)
  

Section 109-1(a) of the Code of Criminal Procedure of 1963 codified the Supreme Court’s holding in 
Gerstein
 and requires that a person arrested with or without a warrant be brought before a judge “without unnecessary delay.”  725 ILCS 5/109-1(a) (West 2000); see also 
Mitchell
, 354 Ill. App. 3d at 401.
  
The Illinois Supreme Court has held that failure to promptly present defendant before a magistrate does not invalidate a confession 
per se
, but it is a factor to consider in determining the voluntariness of a statement.   
People 
v. House
, 141 Ill. 2d 323, 380 (1990); see also 
People v. Williams
, 303 Ill. App. 3d 33, 43 (1999).  Delay alone is insufficient to penalize the State by excluding incriminating statements obtained during the period between arrest and arraignment.  
People v. Dove
, 147 Ill. App. 3d 659, 667 (1986).  To determine if a statement is made voluntarily, we consider the defendant's age, education and intelligence, his experience with the criminal justice system, the duration of the detention and the interrogations, whether the defendant was advised of his constitutional rights, and whether defendant was subjected to physical mistreatment or abuse.  
People v. Groves
, 294 Ill. App. 3d 570, 577 (1998).

The supreme court in 
People v. Ballard
, 206 Ill. 2d 151 (2002), considered section 109-1(a).  In 
Ballard
, the supreme court was faced with the question of whether a 36-hour delay in presentment violated section 109-1(a) and whether any statements made should be suppressed.  
Ballard
, 206 Ill. 2d at 175-76.  The 
Ballard
 court stated that noncompliance with section 109-1(a) “does not, by itself, obviate a confession or render an otherwise voluntary confession inadmissible at trial.”  
Ballard
, 206 Ill. 2d at 176.  Instead, the court cited its decision in 
House
 and reiterated the test for the voluntariness of a defendant’s statements.  
Ballard
, 206 Ill. 2d at 176-77.  The court went on to say that “some latitude is allowed,” and “[p]resentment to a judge need be performed only with such reasonable promptness as the circumstances permit.”  
Ballard
, 206 Ill. 2d at 177.  “[O]nce a defendant in lawful custody has knowingly waived his or her 
Miranda
 rights and indicated a willingness to talk to police, section 109-1(a) does not obligate police to interrupt their interrogation as long as its length is not unreasonable and the defendant's statements continue to be voluntary.  The ‘delay’ involved in taking a voluntary statement from a defendant under these circumstances is ‘necessary’ within the meaning of section 109-1(a).”  
Ballard
, 206 Ill. 2d at 178.  
Ballard
 remains valid authority as to the effect of a delay in presentment on the admissibility of a defendant’s statements.  
Ballard
 and 
Groves
 indicate that a consideration of the voluntariness of a defendant’s statements remains an important factor. 
 

 The facts in the present case are analogous to 
Groves
.  In 
Groves
, the defendant was taken into custody on June 4, 1995, and not presented before a judge until June 8, 1995.  
Groves
, 294 Ill. App. 3d at 573-74.  During that time, the defendant made several voluntary statements to police after waiving his 
Miranda
 rights.  The State argued, as it does in this case, that the reason for the delay was to follow up on the information the defendant had given them.  
Groves
, 294 Ill. App. 3d at 578.  Noting the defendant’s willingness to engage in the ongoing dialogue with the police, the 
Groves
 court upheld the trial court’s denial of the defendant’s motion to suppress.  
Groves
, 294 Ill. App. 3d at 578.

We also note that this case is similar to 
People v. Travis
, 170 Ill. App. 3d 873 (1988).  In 
Travis
, the reviewing court found the defendant was not subject to an illegal detention requiring suppression of his confession.   “The record also establishes defendant was not intoxicated, was not denied food or sleep, nor was he relentlessly interrogated.  Defendant began making incriminating statements the moment he entered the station.  If defendant had not spoken until the last day, his position might have more merit.  However, defendant began speaking promptly, and in each subsequent interrogation, after waiving his rights, gave more incriminating information.  There is absolutely no indication that these statements were the result of anything more than defendant voluntarily speaking after having been advised of his rights and waiving same.”  
Travis
, 170 Ill. App. 3d at 886.  These observations in 
Travis
 fully apply to the present case. 

The facts in this case demonstrate that defendant’s statements were voluntary.  Defendant was 26 years old at the time of his arrest.  Defendant was familiar with the criminal justice system since he had previously been convicted of other felonies.  Defendant’s statement to Driscoll indicated that defendant received food and was allowed to sleep six to eight hours each night.  Defendant was given bathroom breaks when requested.  He was not questioned for extended periods of time.  The testimony at trial indicates that defendant was given 
Miranda
 warnings.  Defendant never expressed any resistance to continuing to speak with the police.  Rather, defendant kept giving different versions of the events leading up to Strong’s murder.  Defendant’s statements went from him seeing Strong get into a car with another man to knowing who killed her and from not being present to arranging to have Strong in specific location for a “violation.”  Defendant also initially denied any sexual contact with Strong, then claimed to have engaged in sexual acts with Strong several day prior to her death, and eventually he admitted that he participated in oral sex with Strong shortly before her death.  Defendant identified other men he claimed were involved in Strong’s death.  The officers investigated each lead given to them by defendant.  In his statement, defendant said the officers treated him fairly.  There is no indication of any abuse or mistreatment by the officers.  

Under 
Ballard
, we find that defendant willingly cooperated with the police from the moment he arrived at Area 1 on April 20.  Defendant never indicated that he was unwilling to continue speaking with the police.  
The voluntary nature of defendant’s statements is not undone by the delay in defendant’s probable cause hearing.  We believe 
Ballard
 and 
Groves
 continue to provide valid authority on this issue.

Defendant relies on 
Willis
 and 
Mitchell
 to contend that defendant’s detention violated his fourth amendment rights and his confession should be suppressed.  However, we find both 
Willis
 and 
Mitchell
 to be distinguishable.  In 
Willis
 and 
Mitchell
, the defendants were held in excess of 48 hours before a probable cause hearing, but neither defendant engaged in willing conversation with the police until well after 48 hours from being taken into custody. 

 In 
Willis
, the defendant was identified as being at the scene of a residential fire minutes before the fire was discovered.  
Willis
, 344 Ill. App. 3d at 872.  Witnesses told police that the defendant was angry because his girlfriend had moved out earlier that day and she moved to the residence where the fire was set.  
Willis
, 344 Ill. App. 3d at 872.  The defendant was picked up by police for questioning and brought to the police station at approximately 4 p.m. on July 13, 1999.  The defendant spoke briefly with the police and denied any involvement in the fire.  The police placed the defendant under arrest at 8:30 p.m. that night.  
Willis
, 344 Ill. App. 3d at 873.  The detective on the case stated that he spent the next two days attempting to locate witnesses in the defendant’s case and did not speak with the defendant on July 14 and only spoke with the defendant for about five minutes on July 15.  
Willis
, 344 Ill. App. 3d at 873-74.  At about 5 p.m. on July 16, 73 hours into the defendant’s detention, the defendant agreed to give a written statement implicating himself in the crime.  
Willis
, 344 Ill. App. 3d at 874.  The defendant was presented the next morning for a bond hearing, 87 1/2 hours after the detention began.  
Willis
, 344 Ill. App. 3d at 874.  On appeal, the reviewing court held that the 73-hour detention before the defendant’s confession exceeded the bounds of a reasonable delay set forth in 
McLaughlin
 and found a fourth amendment violation.  
Willis
, 344 Ill. App. 3d at 878.  The 
Willis
 court noted that “[t]his defendant was placed in a cell and kept there, virtually ignored, except for a visit to the polygraph examiner.  The record is barren of any good reason why defendant was not taken before a judge.”  
Willis
, 344 Ill. App. 3d at 882.  Since 
McLaughlin
 declined to set out a remedy for a fourth amendment violation, the 
Willis
 court determined that suppression of the statements under the exclusionary rule would remove the taint of the unlawful invasion and “discourage police officers from parking an arrestee in a jail cell for more than 48 hours without good reason.”  
Willis
, 344 Ill. App. 3d at 884.  

Mitchell
 followed the reasoning of 
Willis
 to suppress statements obtained in violation of the fourth amendment.  In that case, the defendant was discovered by the police in an alley after a shooting.  The defendant was taken to the police station for questioning between 3 a.m. and 4 a.m. on August 1, 1999, and interviewed for 20 to 30 minutes.  
Mitchell
, 354 Ill. App. 3d at 398.  The defendant was told that he was not being charged and would be released.  The defendant was also asked if he would help with the investigation, so the defendant was voluntarily taken to Area 2.  
Mitchell
, 354 Ill. App. 3d at 398-99.  A codefendant was taken into custody on August 1 and he identified the defendant as the shooter, and the defendant was subsequently arrested at 2 p.m. on August 1.  
Mitchell
, 354 Ill. App. 3d at 399.  Between August 2 and 4, the defendant was interviewed several times by police and an ASA, but the defendant did not make any inculpatory statements.  
Mitchell
, 354 Ill. App. 3d at 399-400.  On August 4, the defendant was identified in a lineup as the shooter.  
Mitchell
, 354 Ill. App. 3d at 400.  After the lineup, the defendant was left alone in an interview room, and a few minutes later, the police found the defendant cutting his wrists with a piece of metal.  
Mitchell
, 354 Ill. App. 3d at 400.  The defendant was taken to the hospital and returned to Area 2 about three hours later.  
Mitchell
, 354 Ill. App. 3d at 400.  The defendant was interviewed in the early hours of August 5, and then later that morning the defendant stated that he wanted to speak to the ASA.  The defendant then gave a videotaped statement, 91 hours after his arrest.  
Mitchell
, 354 Ill. App. 3d at 400.  Relying on 
Willis
, the 
Mitchell
 court found that the defendant was illegally detained in violation of his fourth amendment rights and suppressed the defendant’s statements.  
Mitchell
, 354 Ill. App. 3d at 403-05.      

We distinguish the facts in the present case from  
Willis
 and 
Mitchell
 because in contrast to the facts in those cases, here, defendant made incriminating statements within hours that he was at Area 1.  Here, defendant spoke with police multiple times and implicated himself as having a role in Strong’s death within 24 hours of his arrival at Area 1.  Detective Evans testified that at around 10:45 a.m. on April 21 defendant changed his story to say he was present at Strong’s murder.  Defendant made additional inculpatory statements on the morning of April 22. These statements were made well within the 48-hour window laid out by 
McLaughlin
 and would not be suppressed by a fourth amendment violation.  We find that, under the facts present in this case, 
McLaughlin
 would not invalidate voluntary statements made by defendant after less than 48 hours at the police station.  The facts in 
Willis
 and 
Mitchell
 were significantly different because the first incriminating statements were made after 72 and 91 hours of detention.  Additionally, under 
Ballard
, the supreme court held that police officers are not obligated to interrupt their interrogation as long as the length is not unreasonable and the defendant continues to make voluntary statements.  Such a delay is necessary within the meaning of section 109-1(a).  
Ballard
, 206 Ill. 2d at 178.  We also note that two of the four days defendant was at Area 1 were Saturday and Sunday.  Defendant admitted his role in setting up Strong on Saturday, April 22, and then spent most of Sunday, April 23, speaking with and giving his statement to Driscoll.  In 
Dove
, the reviewing court found that the delay was not unreasonable when 2 days of a 4 1/2-day detention were Saturday and Sunday, court holidays.  
Dove
, 147 Ill. App. 3d at 667; see also 
Mitchell
, 354 Ill. App. 3d at 409 (O’Mara Frossard, J., specially concurring).  In contrast to 
Willis
 and 
Mitchell
, defendant’s willingness to continue speaking with the officers was a good reason why defendant was not taken before a judge at an earlier time.  Even if we were to find a fourth amendment violation, which we do not find, defendant’s inculpatory statements were properly allowed at trial.  Because defendant’s incriminating statements from Friday, April 21, and Saturday, April 22, were properly admitted at trial, defendant cannot satisfy the prejudice prong under 
Strickland
 and his argument must fail.       

The next issue raised by defendant is whether the trial court abused its discretion when it allowed some exhibits into the jury room.  Defendant contends that he was denied due process and his right to a fair trial because the prejudicial effect of the photographs of the crime scene and the autopsy report outweighed the probative value.  Defendant maintains that the crime scene pictures were exceedingly gruesome with little probative value since there was no dispute over the identity of the victim or the cause of death.  The State responds that it had the right to prove every aspect of its case, including the manner of death.

Whether a jury is allowed to see photographs of a decedent is a decision made by the trial court in the exercise of its sound discretion.  
People v. Kitchen
, 159 Ill. 2d 1, 34-35 (1994).  “Among the valid reasons for admitting photographs of a decedent is to prove the nature and extent of injuries and the force needed to inflict them, the position, condition, and location of the body, the manner and cause of death; and to aid in understanding the testimony of a pathologist or other witness.”  
Kitchen
, 159 Ill. 2d at 35.  “If photographs are relevant to prove facts at issue, they are admissible and can be shown to the jury unless their nature is so prejudicial and so likely to inflame the jurors' passions that their probativeness is outweighed.”  
Kitchen
, 159 Ill. 2d at 35.

Here, the trial court thoughtfully considered which photographs to permit into the jury room.  The court listened to arguments and then balanced the prejudicial effect and probative value when it determined that some pictures were cumulative or gruesome.  The court allowed People’s exhibits Nos. 1, 2, and 3 without objection.  Defendant’s attorney objected to People’s exhibits Nos. 5, 6, 7, 9, and 10 as being cumulative.  The court allowed Nos. 5, 6 and 7, but found Nos. 9 and 10 to be cumulative.  People’s exhibit No. 13 was permitted because the court found it highlighted the testimony regarding the shoestring around the victim’s neck.  The court admitted People’s exhibits Nos. 16, 17, 18, 19, and 20 because they showed the apartment and were not pictures of the victim’s body.  The court kept People’s exhibit No. 24 from the jury room because the court found it to be too gruesome.  Of the autopsy pictures, the court only allowed one, People’s exhibit No. 31, because it showed the markings on the victim’s neck from the shoestring.  The court also allowed the medical examiner’s report to go to the jury room over defendant’s attorney’s objection.

We find that the trial court properly exercised its discretion in determining whether to permit exhibits into the jury room.  The court weighed the prejudice to defendant against the State’s right to prove its case with each picture.  As far as the medical examiner’s report, defendant did not cite any authority to show that this was improper and we could find this waived; however, we find that the trial court did not abuse its discretion in allowing the report into the jury room.  Additionally, the trial court did not abuse its discretion in allowing certain pictures to be in the jury room.       

Next, defendant claims that the extended-term sentence of 70 years for his first degree murder conviction is void because the trial court did not make a specific finding for ordering an extended term on the record.  The State responds that even though the basis for an extended-term sentence was not specifically articulated, defendant qualifies for an extended term because defendant had previously been convicted of a Class X felony within 10 years of his murder conviction.  See 730 ILCS 5/5-5-3.2(b)(7) (West 2000).  The State, citing 
People v. Ford
, 198 Ill. 2d 68, 74 (2001), also argues that once defendant was found eligible for the death penalty, the maximum sentence to which he was subject was no longer 60 years but the death sentence.

Under section 5-8-1 of the Unified Code of Corrections, the sentencing range for first degree murder is 20 to 60 years’ imprisonment.  730 ILCS 5/5-8-1(a)(1)(a) (West 2000).  However, the trial court could sentence defendant beyond the maximum if it found him eligible for an extended-term sentence under section 5-5-3.2.  730 ILCS 5/5-5-3.2 (West 2000).  An extended term for first degree murder has a sentencing range of 60 to 100 years. 
730 ILS 5/5-8-2(a)(1) (West 2000).

At defendant’s sentencing hearing, the State presented evidence in aggravation about a prior crime committed by defendant.  Officer Edward Kazupski testified that on November 10, 1993, he arrested an individual named Darius Rowe at a traffic stop after discovering a “sawed off” shotgun on the right side of his pants leg.  When Officer Kazupski processed the vehicle, he found out the vehicle was stolen from Benny Haynes.  Officer Kazupski identified the person he knew as Darius Rowe as defendant.  Detective John McCann testified that he investigated the November 1993 aggravated vehicular hijacking of Benny Haynes.  Haynes identified defendant in a lineup as the person who hijacked her vehicle.  During the course of his investigation, Detective McCann learned that Darius Rowe also went by the name Doris Sterling.  Aggravated vehicular hijacking is a Class X felony, and defendant was convicted of this offense on September 13, 1994, and sentenced to eight years in the Department of Corrections.  720 ILCS 5/18-4 (West 1994). 

During sentencing, the State asked the trial court if the murder sentence was based on an extended term, and the court responded that it was.  The court’s statement that “any sentence death on down is a valid sentence” is irrelevant because the court also indicated that the 70-year sentence was based on an extended term.  The court was aware of defendant’s prior criminal history, especially since the testimony of a prior conviction was given immediately before sentencing, and defendant’s eligibility for an extended-term sentence.  Unlike the circumstances in 
People v. Lenninger
, 88 Ill. App. 3d 801, 806-07 (1980), we are able to ascertain from the comments of the court that it did find an extended-term sentence appropriate for defendant.  

Defendant next contends, and the State concedes, that the trial court erred in sentencing defendant to an extended term for robbery since he was also convicted of first degree murder.  An extended-term sentence may only be imposed on the most serious offense of which an accused is convicted.  
People v. Jordan
, 103 Ill. 2d 192, 205-06 (1984).  Defendant's extended-term sentence for his robbery conviction must therefore be vacated and this cause remanded to the trial court for resentencing on that conviction.

Last, defendant asserts that his credit for time served was incorrectly calculated to be 1,142 days rather than 1,194, and this court should correct the mittimus to reflect the correct number.  The State concedes that the mittimus should be corrected to reflect 1,194 days’ credit for time served.  Under Supreme Court Rule 615(b)(1), this court has the authority to order a correction of the mittimus.  134 Ill. 2d R. 615(b)(1).  Accordingly, we order that defendant's credit for time served be corrected in the mittimus to reflect 1,194 days.

For the foregoing 
reasons, Sterling's conviction and sentence for first degree murder are affirmed, his robbery sentence is vacated and remanded for resentencing, and the mittimus is corrected.

  Affirmed in part and vacated in part; cause remanded.

CAHILL, P.J. and GORDON, J., concur.